## Petition of Department of Public Service for Relief in Regard to Small Power Production Under PSB Rule 4.100

[596 A.2d 1303]

No. 88-266

Present: **Allen, C.J., Peck, Gibson, Dooley and Morse, JJ.**

Opinion Filed June 28, 1991

*Abell, Kenlan, Schwiebert & Hall, P.C.,* Rutland, for Appellant.

*Paterson & Walke, P.C.,* Montpelier, for Appellee Green Mountain Power Corporation.

*Robert V. Simpson, Jr.,* Special Counsel, and *James Volz,* Director for Public Advocacy, Montpelier, for Appellee Department of Public Service.

**Dooley, J.** Appellant Ryegate is a small power producer seeking to overturn a decision of the Public Service Board (PSB) denying it rates set forth in an executed letter of intent with the Vermont Power Exchange, Inc. (VPX). We affirm.

Ryegate is the successor-in-interest to Decker Energy International, Inc. On December 30, 1985, Decker entered into a letter of intent to sell to VPX power Decker would produce at a facility to be built in Randolph. The company's plan was tailored to benefit from the federal Public Utility Regulatory Policies Act of 1978 (PURPA), 16 U.S.C. §§ 2601–2645 (1988), enacted to combat oil shortages and to encourage alternative forms of energy production. See *In re Vicon Recovery Systems,* 153 Vt. 539, 543, 572 A.2d 1355, 1357 (1990) (discussing objectives of the Act). The states are charged with implementing PURPA, under rules promulgated by the Federal Energy Regulatory Commission (FERC). In Vermont, implementation of the statute has been assigned to the Public Service Board. See 30 V.S.A. § 209(a)(8); *In re Vicon,* 153 Vt. at 547, 572 A.2d at 1359. The PSB's plan implementing PURPA created a single purchasing agent to contract on behalf of all Vermont utilities for the purchase of power from qualifying small power production facilities. Vt. Pub. Serv. Bd. Rule 4.100, §§ 4.103(A)(8), 4.104(A) (as revised Aug. 28, 1985). Under authority of the Rule, PSB has designated VPX to function as the purchasing agent.

Under Rule 4.100, the Department of Public Service determines rates utilities pay for power generated by qualifying facilities, subject to the approval of the PSB. The rates and rate order at issue in this case were approved by the Board on November 18, 1985, in Docket No. 4933, providing for qualifying facilities to sell up to 150 megawatts of power through long-term contracts of up to thirty years (as late as 2018). The rates were calculated on the basis of "avoided cost," which means the "incremental cost to electric utilities of electric energy or capacity or both, which, but for the purchase from the qualifying facility, such utilities would generate themselves or purchase from another source." Rule 4.100, § 4.103(A)(1); see 18 C.F.R. §§ 292.101(b)(6), 292.304(b)(2) (1990).

VPX established procedures detailing the general process set forth in Rule 4.100, and, on June 25, 1984, issued a *Producer's Guide for Power Sales Under Public Service Board Rule 4.100.* The guide states in relevant part:

> As an option, VPX will sign a Letter of Intent with producers who are awaiting the necessary Board approvals. This offer will set out deadlines for application to the Public Service Board, signing a Purchase Agreement with VPX, and project completion. The signed Letter will hold a producer's place in the first 25 MW decrement of power committed to the agent so long as the producer meets the agreed to development schedule.
>
> . . . .
>
> Producers needing PSB approval for a 248 Certificate and/or levelized rates have the option of applying for a Letter of Intent. The letter will state, for the sales option selected, a minimum price for the power generated by the project and a date for filing Board petitions for permits and rate approval, and a project completion schedule. The Letter of Intent will hold the producer's place in the decrement. *The Letter of Intent is conditioned upon final Board approval of the rate option selected and remains valid so long as the producer meets the agreed to development schedule.* (Emphasis added.)

Ryegate's predecessor signed a letter of intent with VPX on December 30, 1985. The letter of intent is an agreement to enter into a long-term power purchase and sale contract if certain

conditions are satisfied. It provides that the producer's first 8.855 megawatts of power would be sold at the "appropriate 30 year rate approved by the Vermont Public Service Board in docket number 4933." The rate for the balance of the power does not involve Docket No. 4933 and is not in issue. The agreement is conditioned on the producer applying to the PSB for a certificate of public good within forty-five days, commencing construction within six months of receiving the certificate, and completing construction within twenty-four months thereafter. It is also conditioned on the PSB determining an applicable rate and the producer entering into the purchase and sale agreement within sixty days thereafter.

The letter of intent was restated and signed by Ryegate and VPX in May of 1987. The site of the project was changed from Randolph to Ryegate. None of the relevant terms were changed.

PURPA rates were approved in Docket No. 4933 on November 11, 1985. The order contains extensive rate schedules, depending upon the length of the purchase and sale contract (up to 30 years) and the decrement (that is, block of 25 megawatts) within which the project falls. The applicable rate also depends upon the start date of the project. The schedules provide for start dates from the summer of 1985 through the winter of 1987–1988. There are no rate schedules applicable to projects that started to deliver power after April 30, 1988.

On September 24, 1986, the Department petitioned the PSB for a declaratory ruling that rate options being offered to producers and certain other VPX practices were illegal. The catalyst for the Department's action was that, due to an unexpected fall in world oil prices, the rates approved in Docket No. 4933 represented significant overestimates of the avoided cost of energy. Part of the Department's position was that the VPX letters of intent did not foreclose the PSB from denying Docket No. 4933 rates to projects like Ryegate's if they did not start delivering power by April 30, 1988.

On August 26, 1987, the PSB issued an order concluding that the VPX letters of intent were not binding obligations given the involuntary nature of the letters vis-a-vis the utilities and that "[c]ontract analysis, therefore, is simply inapposite." It also concluded that "because the letters are contingent, they are not

'binding obligations' within the meaning of the FERC regulations." It ruled, however, that qualifying facilities that came on line by April 30, 1988—the date the relevant Docket No. 4933 rate schedule was to begin—should receive the rates. Although the rate order in Docket No. 4933 had not explicitly declared that it was limited to qualifying facilities coming on line by April 30, 1988, the PSB concluded that such a deadline was implied in the temporal framework of the schedule. Finally, it concluded that no claims of equitable entitlement under the letters of intent would follow unless the "sole substantial purpose" of the letters had been to secure a particular rate. Because there were other significant purposes for the letters of intent, it concluded that they did not create equitable rights.

Ryegate advances three main theories under which it claims the right to Docket No. 4933 rates irrespective of when it starts delivering power: (1) it is entitled to those rates under PURPA; (2) it has an enforceable contract with VPX for those rates; and (3) it has a vested right to those rates. We take these arguments in turn.

## I. PURPA RIGHTS

The parties appear to agree that the relevant law in determining whether Ryegate has a right to Docket No. 4933 rates is contained in regulations issued by the Federal Energy Regulatory Commission with respect to "Small Power Production and Cogeneration." See 18 C.F.R. §§ 292.101–292.602 (1990). The operative section of these regulations is § 292.304(d), which provides:

> *Purchases "as available" or pursuant to a legally enforceable obligation.* Each qualifying facility shall have the option either:
>
> (1) To provide energy as the qualifying facility determines such energy to be available for such purchases, in which case the rates for such purchases shall be based on the purchasing utility's avoided costs calculated at the time of delivery; or
>
> (2) To provide energy or capacity pursuant to a legally enforceable obligation for the delivery of energy or capacity over a specified term, in which case the rates for such purchases shall, at the option of the qualifying facility exer-

cised prior to the beginning of the specified term, be based on either:

(i) The avoided costs calculated at the time of delivery; or

(ii) The avoided costs calculated at the time the obligation is incurred.

The two rate options contained in § 292.304(d)(2) correspond to the rate options available under the VPX letter of intent. The second option is for the rates specified in Docket No. 4933. These rates are available as a matter of federal law, however, only as of the date Ryegate incurs "a legally enforceable obligation for the delivery of energy or capacity over a specified term." § 292.304(d)(2). The question under federal law reduces to whether Ryegate incurred such an obligation when it signed the VPX letter of intent.

The obligation specified in the federal regulation is Ryegate's obligation to deliver energy over a specified term. See *Snow Mountain Pine Co. v. Maudlin*, 84 Or. App. 590, 599, 734 P.2d 1366, 1370–71 (1987). We have examined carefully the letter of intent in the context of the entire Vermont scheme to implement PURPA and the VPX producer's guide. The letter clearly binds VPX as a matter of allocation of the power purchase obligations and rates available to it. Nowhere, however, has Ryegate assumed a legally enforceable obligation to deliver any energy to VPX and through it to the utilities and consumers in the state. At best, Ryegate has obligated itself to go through a number of development and regulatory steps that may lead to an obligation to deliver energy, if all goes well.

Ryegate appears to make three arguments to respond to the wording of the regulation. First it notes that the failure to find it is entitled to Docket No. 4933 rates undermines the intent of FERC "to ensure that a qualifying facility which has obtained the certainty of an arrangement is not deprived of the benefits of its commitment as a result of changed circumstances." 45 Fed. Reg. 12224 (1980). The FERC intent is applicable, however, only when there is the "certainty of an arrangement" as defined in the regulation. Having never provided that certainty, Ryegate has no entitlement to be immune from changed circumstances.

The second argument is that the PSB violated PURPA by not providing Ryegate a legally binding obligation to sign. We find nothing in the federal law that imposes that obligation on the PSB. Nor has Ryegate made any showing that it was prepared to sign such an agreement. Ryegate can obtain the benefit of federal law only by "tendering an agreement that obligates it to provide power." *Snow Mountain Pine Co.*, 84 Or. App. at 600, 734 P.2d at 1371.

Third, Ryegate argues that the PSB violated PURPA by terminating the availability of Docket No. 4933 rates without creating an alternative, thus taking away its rights to rates calculated on avoided costs on the date it incurs its obligation to provide power. Apparently there was a gap between April 30, 1988—the date by which a project had to be in operation to qualify for Docket No. 4933 rates—and the date on which the PSB issued a new rate order. Nothing in the record indicates that Ryegate tendered a legally binding obligation to deliver power during that gap. Further, there is no indication that the PSB was unwilling to calculate rates on a case-by-case basis during the gap period. We see no violation of Ryegate's rights under PURPA.

## II. CONTRACT RIGHTS

■ Ryegate next argues that the VPX letter of intent gave it a contractual right to Docket No. 4933 rates and that the right could not be diminished by a PSB order. The PSB answered this claim by concluding that Ryegate's rights were derived wholly from regulatory law and not from contract. To understand this point, we must look at the nature of VPX.

The PSB created VPX to serve as an intermediary between small power producers and private utilities who are obligated under PURPA to purchase power from the small producers. The purpose of VPX is to insure proper financial and power accounting so every utility takes on its fair share of the state's PURPA obligation. See Vt. Pub. Serv. Bd. Rule 4.100, §§ 4.103(A)(8), 4.104(A). VPX is not a utility. Its agreements are binding on utilities only to the extent provided by law and PSB regulations. In no sense have the utilities agreed to any actions of VPX. Their obligation to purchase power pursuant to VPX contracts is entirely created by the PURPA laws and associated regulations.

The power of VPX to agree and bind the utilities exists only to the extent PURPA and federal and state implementing regulations create that power. Thus, we agree with the PSB that this case is about regulatory law, not VPX contracts. See *Snow Mountain Pine Co.*, 84 Or. App. at 598, 734 P.2d at 1370. In this light, Ryegate's argument that it has a binding obligation with VPX is of no assistance to it. Any agreement of VPX is binding on the PSB or on the utilities only to the extent that PURPA and the applicable regulations make it so. As we discussed above, Ryegate has no rights under PURPA.

## III. VESTED RIGHTS

■ Finally, analogizing the letter of intent to a building permit, Ryegate argues that it has a vested right to Docket No. 4933 rates. Thus, it seeks to invoke the vested rights doctrine as developed in *Preseault v. Wheel*, 132 Vt. 247, 315 A.2d 244 (1974), and *Smith v. Winhall Planning Comm'n*, 140 Vt. 178, 436 A.2d 760 (1981). While we recognize the similarities giving rise to the analogy, we are more persuaded by the differences. The question here is whether we can require electricity consumers to pay rates above those established by the marketplace to protect the producer's investment in facilities and development costs. Ordinarily, the private producer of any commodity must take the risk that the price available at the time of production will result in a sufficient profit. Ryegate's risk in this case is no different.

In this special case, however, we are willing to reduce the marketplace risk to achieve a public benefit of increased reliance on renewable energy sources. The equation of public benefit and public burden is set out in PURPA and its implementing regulations. We will not apply vested rights doctrine to change the equation to expand private rights at the expense of an added public burden.

We have, in fact, recognized similar limits on the applicability of vested rights even in permit cases. Thus, in *In re Ross*, 151 Vt. 54, 56, 557 A.2d 490, 491 (1989), we held: "*Smith* should not be interpreted as an open-ended right to 'freeze' the applicable regulatory requirements by proposing a development with inadequate specificity." The FERC requirement for a legally enforceable obligation can be viewed as a requirement for

adequate "specificity" to give the producer a vested right to the rate option contained in the regulation. Ryegate failed to provide the necessary specificity.

To the extent Ryegate is raising an estoppel claim against the PSB, we note that the PSB allowed individual producers who could not meet the April 30, 1988, deadline to show that "their unique circumstances have created an entitlement to 4933 rates." Ryegate attempted to make the requisite showing in a separate proceeding, but the PSB found that its failure to achieve commercial operation by April 30, 1988, resulted not from administrative or regulatory delay but from Ryegate's own conduct. That order was appealed to this Court, and the appeal was voluntarily dismissed by Ryegate. Ryegate is now foreclosed from showing an estoppel.*

In view of our disposition of Ryegate's argument, we need not reach the alternative rationale for the PSB's order that Docket No. 4933 rates were always limited to projects in operation by April 30, 1988.

*Affirmed.*

**Morse, J.,** dissenting. The Court says "this case is about regulatory law, not VPX contracts" and concludes that regulatory law does not mandate enforcement of the letter of intent because it is not a "legally enforceable obligation." I respectfully depart from the Court's interpretation of the language "legally enforceable obligation for the delivery of energy or capacity over a specified term" found in FERC regulation § 292.304(d)(2). I believe Ryegate obligated itself to provide power in the letter of intent so long as certain conditions were met. Conditional "obligations" may be "legally enforceable," and nothing in the regulations says they are not. I would reverse.

---

* Because of the dismissal of the appeal in the separate proceeding, Green Mountain Power Corp. moved to dismiss "the claim of error" based on its estoppel argument. We have addressed the merits of the argument and deny the motion to dismiss.

## I.

For purposes of this case, I read the words "legally enforceable obligation for the delivery of energy or capacity over a specified term" simply to mean a contract "for the delivery of energy or capacity over a specified term." How can the words "legally enforceable obligation" mean anything less in this context?

The phrase "legally enforceable obligation" has been interpreted expansively. In *Snow Mountain Pine Co. v. Maudlin*, 84 Or. App. 590, 599, 734 P.2d 1366, 1370–71 (1987), the mere tender of a contract by a qualifying facility to provide power was a "legally enforceable obligation" because under FERC regulations a "facility's self-imposed obligation *to deliver energy* triggers a utility's obligation *to purchase energy*." (Emphasis in original.) Thus, contrary to the Court's analysis that "regulatory law" restricts the common law of contracts, the common law is expanded. Therefore, at the very least, "legally enforceable obligation" means a contract. Why this case isn't about contract law is bewildering.

Furthermore, the Court's opinion flatly contradicts an important policy set forth in the regulatory law. As the introduction to the regulations found at 18 C.F.R. § 292.304(b)(5) states:

> The import of this section is to ensure that a qualifying facility which has obtained the *certainty of an arrangement* is not deprived of the benefits of its commitment as a result of changed circumstances. This provision can also work to preserve the bargain entered into by the electric utility; should the actual avoided cost be higher than those contracted for, the electric utility is nevertheless entitled to retain the benefit of its *contracted for, or otherwise legally enforceable*, lower price for purchases from the qualifying facility.

(Emphasis added.)

Because "certainty of an arrangement" can be achieved by the mere tender of a contract, the Court turns the regulatory landscape upside down by holding that not even a contract provides "certainty of arrangement." I suspect, given this approach, the Court does not think the letter of intent is a contract. Its analysis of the validity of the letter of intent is as follows:

> We have examined carefully the letter of intent in the context of the entire Vermont scheme to implement PURPA and the VPX producer's guide. The letter clearly binds VPX as a matter of allocation of the power purchase obligations and rates available to it. Nowhere, however, has Ryegate assumed a legally enforceable obligation to deliver any energy to VPX and through it to the utilities and consumers in the state. At best, Ryegate has obligated itself to go through a number of development and regulatory steps that may lead to an obligation to deliver energy, if all goes well.

Under applicable precedent, however, I believe the Court is wrong.

In the letter of intent, VPX and Ryegate agreed to enter into a long-term contract for the purchase and sale of a specified amount of power at a specified rate provided certain conditions were met. The parties exchanged promises: VPX to buy and Ryegate to sell power. A party's promise is consideration for the other party's promise. *H.P. Hood & Sons v. Heins*, 124 Vt. 331, 337, 205 A.2d 561, 565 (1964). The contract was conditioned on four events happening: (1) within 45 days, Ryegate must have applied for a certificate of public good, 30 V.S.A. § 248; (2) within six months of receiving the certificate (excluding winter months), Ryegate must have begun construction of its power facility; (3) Ryegate must then have completed construction of the facility and be prepared to deliver power within twenty-four months after construction commenced; and (4) Ryegate must have executed a long-term agreement within sixty days of rate approval by PSB. If Ryegate failed to meet all these conditions, the obligations to sell and to buy would have terminated.

In this technological age when lead time between planning, financing, and construction is considerable and critical to the success of major construction, projects are often undertaken under conditional agreements. Restatement (Second) Contracts § 224 (1981) defines a "condition" as "an event, not certain to occur, which must occur . . . before performance under a contract becomes due." Cases upholding such contracts are legion. See *id.* (cases collected in appendix).

The asymmetry of obligation inherent in the letter of intent does not undermine its enforceability. What apparently bothers

the Court is that the letter of intent is, as the Board stated, "not founded on mutual voluntary undertakings," that is, VPX promised certain rates but Ryegate was not bound to produce any power. "Mutuality of obligation," however, is not essential to an enforceable contract; any independent meaning that this term may once have had has been subsumed into the concept of adequacy of consideration. Restatement (Second) Contracts § 79(c) and comment a (1981). Further, the requirement that there be consideration is not synonymous with a requirement of equal or coextensive promises. See *Hood*, 124 Vt. at 338, 205 A.2d at 566; 1 S. Williston, Law of Contracts § 105A, at 425 (3d ed. 1957). Even if one party has options not provided to the other party— e.g., to cancel or renew the contract or to determine the extent of performance—the contract is not per se unsupported by consideration. Rather, a contract is incomplete only if one party's obligations are so attenuated as to render consideration merely illusory. Williston at 424–25.

Although Ryegate could have put an end to the venture by failing to meet one of the conditions and VPX had no corresponding power to end it if Ryegate continued to meet the conditions, consideration (the exchange of promises) was not illusory. A promise is illusory only if the promisor's future action is not limited in any way. 1 A. Corbin, Corbin on Contracts § 149, at 657 (1963). See, e.g., *Scott v. Moragues Lumber Co.*, 202 Ala. 312, 314, 80 So. 394, 396 (1918), which Corbin uses to illustrate this principle. If A promises to charter a boat to B on specified terms and the promise is conditioned on A buying the boat, then A is bound either to buy the boat and charter to B or not to buy the boat at all; A cannot buy the boat and not charter to B. Although a letter of intent does not obligate a producer to build a plant or to produce any power, once a producer performs, it must sell the agreed upon amount of power to VPX at the agreed upon rate.

That a "locked-in" rate was critical to Ryegate in going forward with its project cannot be doubted. Would a producer undertake the planning, the financing, the regulatory process, and the construction of a power plant, knowing that anytime along the way the "certainty of the arrangement" on rates was in doubt depending on economic fluctuations in the electric utility market? Indeed, the assumption behind PURPA is that without

a locked-in rate ensuring a basis for economic planning and profit, small producers would not be induced reasonably to enter the market. See, e.g., 18 C.F.R. § 292.304(d)(2) (small power producers contracting to deliver energy may choose to have purchase price based on avoided costs calculated either at the time of delivery or at the time of contract). The producer's promise is not merely illusory, and therefore the letter of intent is an enforceable contract.

The Department is candid that its action is based on changed conditions in the energy marketplace since the letter of intent with Ryegate and similar letters with others were signed. The Department's position, however, denies small power producers like Ryegate the very sense of stability and predictability that the PURPA and the Board's rule were intended to promote. I cannot doubt that the letter of intent is an enforceable agreement fulfilling the very purposes that the Board intended for it, at least viewed from the moment of the adoption of Rule 4.100, rather than with the benefit of hindsight viewed from atop the remains of a collapsed oil market.

In sum, the letter of intent was a "legally enforceable obligation" by Ryegate "for the delivery of energy," 8855 kilowatts, "over a specified term," 30 years. The plain meaning of the applicable regulation was met.

## II.

Because I would reverse the Board's decision, I address the issue raised by the date of on-line capability as it relates to the thirty-year rate schedule. A reason for denying Ryegate the 4933 thirty-year rates was the Board's view that being on-line by April 30, 1988, was a condition precedent for receiving them. The Board and Department do not contend that adjustments in the rate schedule for 4933 would be theoretically impossible or practically unmanageable. Rather, they argue that to make adjustments in a particular case would result in a rate that was not a "docket 4933 rate" and hence would not be what Ryegate bargained for. This is a brittle view of contract law in the face of the complexity of forecasting "avoided costs" into the distant future. The Board is correct that a 4933 rate adjusted to the date of appellant's actual commencement of operations is not literally the "same" schedule as that ordered in the proceeding.

But that position, if determinative, would bar the equitable adjustment of contract provisions to allow for changes in circumstances and to fulfill the intention of the parties.

I agree that the Board could have set a coming-on-line deadline in Docket 4933 or VPX could have included a deadline as a condition in its letter of intent. Neither was done, and reference to Docket 4933 in the letter of intent does not necessarily imply such a deadline.

The Board stated that producers like Ryegate "do not deny that the temporal limitation of 4933 rates is inherent in the rate structure or that they were unaware of it," but constructive knowledge of the rate schedule's temporal nature cannot be bootstrapped into becoming a contract condition where none previously existed.

A qualifying facility executing a letter of intent with VPX with respect to the rates in Docket 4933 would be aware that these rates were lagged to six different periods, with a concluding date for the last period of April 30, 2018. Such knowledge, however, simply does not define the reasonable expectation of a qualifying facility agreeing *expressly* to lock in 4933 rates.

The Board's position is basically that time was of the essence: if Ryegate was to benefit from the terms of the letter of intent, it had to meet the time requirements specified in the contract. See *Mouat v. Wolfe*, 150 Vt. 637, 639, 556 A.2d 99, 101 (1989) (quoting 6 S. Williston, Law of Contracts § 846, at 181 (3d ed. 1962)). Even if the parties had expressly stated a deadline, time would not necessarily be of the essence. *Colony Park Associates v. Gall*, 154 Vt. 1, 4, 572 A.2d 891, 893 (1990). Rather,

> [t]he general rule in equity is that time is not of the essence of the contract, and equity will not treat it as of the essence of the contract unless it affirmatively and clearly appears that the parties so regarded it. . . . It is not enough that a specific time be named in the contract; the court is to look at the whole scope of transaction to see whether the parties really meant the time named to be of the essence of the contract.

*Id.* (quoting *McLean v. Windham Light & Power Co.*, 85 Vt. 167, 182, 81 A. 613, 619 (1911)).

Here no coming-on-line deadline was specified. Although the contract contains some intermediate deadlines presumably in-

tended to keep the project on track, it notably omits a specific closing date. Nothing in the parties' conduct at the time of signing the contract or subsequently indicates that they were operating under a deadline. There is no indication that VPX checked up on Ryegate's progress or warned it that it was in danger of losing its rates by falling short of a deadline. See *id.* at 4–5, 572 A.2d at 893–94.

That Docket 4933 rates ended on April 30, 2018, does not mandate interpreting the letter of intent to include a coming-on-line deadline. More plausible interpretations are that once 4933 rates were exhausted, say, for example, in twenty-nine years, either new rates could be formulated consistent with 4933 projections to cover the thirtieth year or rates from whatever docket was then in effect could be substituted. Further, under appellant's letter of intent, the 4933 rates apply only to the first 8855 kilowatts of power produced (less than half of the total contracted for). As a practical matter, Ryegate would have switched over to another docket rate well before its thirtieth year. The inconsistency between the length of the docket and the length of the contract would then not be an issue. In short, the fact that Ryegate may be subject to only twenty-nine or so years of the 4933 thirty-year rate schedule is not a large enough tail to wag the dog. The Department is obviously not concerned with the thirtieth year of the contract; rather, it is concerned that producers who signed letters of intent referenced to Docket 4933 will be receiving rates that now look inflated. But that was precisely the risk that both parties took.

The Board legitimately should be concerned that letters of intent not be open-ended. It is reasonable that producers must take action within specified time frames or lose the benefit of the rates stated in the letter of intent. This case does not present an open-ended schedule. So long as Ryegate proceeded in good faith, it had a reasonable time to open its plant.

The Court's hands-off approach to the Board's sleight of hand may serve as a blessing to ratepayers in this case, but, in my opinion, is bad utility law. If a contract is not a contract when ratepayers are adversely affected, would-be power producers will think twice before committing capital to projects, and that will eventually drive up energy costs for everyone. The Court's analysis reminds me of the "curdled cliche" that an oral promise isn't worth the paper it's written on.

I dissent.