## Petition of East Georgia Cogeneration Limited Partnership

[614 A.2d 799]

No. 91-345

Present: **Allen, C.J., Gibson, Dooley and Morse, JJ., and Peck, J. (Ret.), Specially Assigned**

Opinion Filed May 28, 1992

526

*Gerald R. Tarrant*, Montpelier, and *Stephen G. Kozey* of *Skadden, Arps, Slate, Meagher & Flom* (Of Counsel), Washington, D.C., for Plaintiff-Appellant.

*Joseph Kraus*, Rutland, and *Ralph W. Howe III* of *Paterson & Walke, P.C.* (Of Counsel), Montpelier, for Defendant-Appellee Central Vermont Public Service Corp.

*Michael Marks* of *Lisman & Lisman*, Burlington, for Defendant-Appellee Vermont Power Exchange, Inc.

*Geoffrey Commons*, Montpelier, for Defendant-Appellee Department of Public Service.

**Allen, C.J.** Appellant East Georgia Cogeneration Limited Partnership (EGC) appeals from an order of the Vermont Public Service Board (Board) denying a certificate of public good for EGC's proposed cogeneration facility. Appellees are Central Vermont Public Service Corporation (CVPS), a utility that would be required to purchase output from the proposed EGC facility; the Department of Public Service (DPS), which repre-

sents the interests of Vermont's ratepayers before the Board; and the Vermont Power Exchange, Inc. (VPX), the designated purchasing agent for output from cogeneration facilities. The Board's order is affirmed.

EGC proposed to build a 29-megawatt gas turbine cogeneration facility in the East Georgia Dairy Industrial Park in Georgia, Vermont. It designed the power plant to be a "qualifying facility" under § 210 of the Federal Public Utility Regulatory Policies Act of 1978 (PURPA). 16 U.S.C. § 824a-3. EGC gained its status as a "qualifying cogenerator" by contracting with the Vermont Whey Company to provide steam generated by the plant for that enterprise. EGC entered into a power sales agreement with VPX to sell its entire output of electrical energy at rates established by the Board. The Board reviewed the agreement between EGC and VPX and concluded that, at the "levelized" rates sought by EGC, there was neither present nor future need for the project's output. The Board, in rejecting EGC's application for a certificate of public good, also concluded that the project would not result in economic benefit to the state and its residents.

On appeal, EGC argues that federal law entitled it to rates established by the Board under Docket No. 5177, and that the Board cannot deny those rates based on its assessment of need and economic benefit. EGC also maintains that the Board's order amounted to a collateral attack of Docket 5177 rates in violation of state law, federal law, and the Board's own decisions. Finally, EGC argues that it secured a vested right to Docket 5177 rates when it tendered a power sales agreement to VPX. CVPS contends that EGC was properly denied a certificate of public good because it failed to satisfy the requirements for such a certificate. CVPS also argues that the agreement between EGC and VPX is not legally enforceable. DPS contends that the power purchase agreement between VPX and EGC was not part of the record below and that we should not, therefore, construe that document. DPS also emphasizes that state review of the contract was warranted because EGC sought levelized rates, which are higher than those mandated by federal law. VPX contends that EGC was entitled to Docket 5177 rates because it executed a legally enforceable agreement which satisfied state and federal requirements. Before reaching the is-

sues presented, we set forth the regulatory framework, the relevant facts as found by the hearing officer and adopted by the Board, and the procedural history of this case. We also state the standards that apply to this Court's review of administrative orders.

## REGULATORY FRAMEWORK

Congress enacted PURPA in 1978 to combat the nationwide energy crisis by encouraging the development of cogeneration and small power production facilities. See *In re Vicon Recovery Systems*, 153 Vt. 539, 543, 572 A.2d 1355, 1357 (1990). A "cogeneration facility" produces both electrical energy and steam or other forms of useful energy for industrial or commercial purposes. 16 U.S.C. §§ 824a-3(j), 796(18)(A). PURPA encourages the development of cogeneration by requiring utilities to purchase output from such facilities at rates not to "exceed [] the incremental cost to the electric utility of alternative electrical energy." *Id.* § 824a-3(b). PURPA further provides that the rates for such purchases "shall be just and reasonable to the electric consumers of the electric utility and in the public interest." *Id.*

Charged with implementation of PURPA, the Federal Energy Regulatory Commission (FERC) promulgated rules that set the rates for purchases of output from qualifying facilities by utilities, absent negotiated rates, at "avoided cost." 18 C.F.R. §§ 292.301(b), 292.304(d). "*Avoided costs* means the incremental costs to an electric utility of electric energy or capacity or both which, but for the purchase from the qualifying facility . . . , such utility would generate itself or purchase from another source." *Id.* § 292.101(b)(6). FERC places implementation of its avoided cost scheme in the hands of state regulatory authorities. *Id.* § 292.401(a).

The Public Service Board issued Rule No. 4.100 to meet Vermont's responsibilities under PURPA and the FERC regulations. The rule defines a "qualifying facility" as a cogeneration or small power production facility under federal and state law which has also "received a certificate of public good under 30 V.S.A. § 248." 4.103(A)(9). The rule also establishes the authority of the Board to designate a purchasing agent, 4.102(C), and directs that agent to purchase electricity offered by any qualifying facility located in Vermont and to sell such power to all

Vermont electric utilities on a pro rata basis. 4.104(A). The purchasing agent, however, "shall not be empowered to enter into any agreement for purchases from a qualifying facility until such agreement shall have been approved by the Board." *Id.* The Board adopts rates for purchases at the utilities' "full avoided costs . . . as specified under 4.104(E)." *Id.*

Rule 4.104(E) requires the Department of Public Service to "annually determine the avoided capacity and energy costs of the Vermont composite electric utility system, and . . . file proposed rate schedules with the Board for approval." The Board, "after hearing, shall approve or modify such schedules." *Id.* The rates adopted must provide three options to qualifying facilities: "short-term sales," which have a term of one year; "long-term non-firm sales," which have a term of five, ten, or fifteen years; and "long-term firm sales," which have a term of ten, twenty or thirty years. 4.104(E)(1),(2),(3). Pursuant to this rule, the Board adopted the rate schedule involved in this appeal. PSB Docket No. 5177 (March 13, 1989). To remain eligible for those rates, "[p]rojects . . . must satisfy the requirements of Rule 4.100 and achieve commercial operation by April 30, 1993." *Id.* at 4.

A qualifying facility which is eligible for firm rates may elect nonlevelized, fully levelized, or partially levelized rates. 4.104(E)(5). Levelized rates provide a constant revenue stream by converting a series of annual rates to an equivalent annuity, resulting in larger payments during the early years of a project's operation. See *In re Hydro Energies Corp.*, 147 Vt. 570, 571 n.1, 522 A.2d 240, 240 n.1 (1987). All long-term and levelized rates "shall be available only to qualifying facilities which have been found by the Board, after due hearing, to satisfy the substantive criteria of 30 V.S.A. § 248(b)." 4.104(H). Section 248(b) sets forth the criteria for obtaining a certificate of public good from the Board. Before issuing a certificate, the Board must find, inter alia, that the proposed facility "is required to meet the need for present and future demand for service which could not otherwise be provided in a more cost effective manner," 30 V.S.A. § 248(b)(2), and "will result in an economic benefit to the state and its residents." *Id.* § 248(b)(4). No entity may begin construction of an electric generation facility without first obtaining a certificate of public good from the Board. *Id.* § 248(a)(2).

## FACTS AND PROCEDURAL HISTORY

EGC's proposed facility was designed to produce both steam and electric power. The plant was to consist of (1) a gas-fired turbine and electric generator, and (2) a heat-recovery boiler, steam turbine, and electric generator. The steam produced would be sold to the Vermont Whey Company. The steam contract, executed in January of 1990, would result in an annual loss to EGC of approximately $200,000 per year. EGC also executed a gas supply contract with a large Canadian supplier securing a firm twenty-year supply of natural gas from Alberta or Saskatchewan. To secure this long-term, secure contract, EGC paid a premium estimated at between six and nine million dollars.

EGC eventually sought from the Board approval of twenty-year, 58 percent levelized rates. EGC and VPX had a long-standing relationship leading to the power purchase agreement that contained these rates. VPX originally solicited 150 megawatts of power, divided into 25-megawatt decrements, from small power producers and cogenerators under Rule 4.100. Rates set by the Board established that each subsequent decrement receive a lower price based on the decreasing need for additional sources of energy. EGC signed a letter of intent with VPX in 1985, placing the project in the sixth decrement position for Docket No. 4933 rates. After the adoption of Docket 5177 rates by the Board in March 1989, VPX and EGC entered into a power sales agreement incorporating those rates and filed for approval with the Board in June 1989.

The Board compared Vermont's "presently committed generation mix" to projected annual peak load and capacity requirements, taking into account the likely availability of power from Hydro Quebec, and found a capacity excess through 1998. The EGC facility would contribute to the energy excess and would produce energy costing, on a weighted average basis, $.0765/kwh, which would displace energy costing $.0285/kwh. The Board found that this would result in a net cost to CVPS of approximately $5,000,000 in 1993. It estimated that Vermont ratepayers would, over the twenty years of the agreement, pay $40,000,000 more for power produced by the proposed project than it would for the same quantity of power from Hydro Quebec. The Board also found that the proposed project was

relatively low risk, and that the requested 58 percent levelization was not required for economic viability.

EGC initially filed a petition for a certificate of public good in May 1986 to build its facility, seeking approval of thirty-year, firm, nonlevelized rates. Several factors caused delay of the project, including: Express Foods' sale of its whey plant to Wyeth Nutritionals, Inc., the Board's reconsideration of avoided-cost rates, which ultimately resulted in Docket 5177 rates, and Green Mountain Power Corporation's decision to appeal those rates. In June 1989, after executing a power purchase agreement with VPX, EGC sought approval of twenty-year, firm, partially levelized rates. The Board consolidated that request with the earlier request for a certificate of public good.

The Board held a hearing in January 1991. The hearing officer, who reviewed the project in accordance with 30 V.S.A. § 248, made extensive findings and concluded that, at the requested levelized rates, there was no present or future need for output from the proposed project. The hearing officer also concluded that, given the availability of significantly less expensive alternate power sources, the project did not provide an economic benefit to the state. The Board adopted the findings of the hearing officer and issued an order denying the project a certificate of public good and the requested rates, but noted that EGC should be given an opportunity to seek approval of rates which reflect "today's marketplace realities." EGC appeals from that order.

## STANDARD OF REVIEW

We begin with a strong presumption that orders issued by the Public Service Board are valid. See *In re Village of Lyndonville Electric Dep't*, 149 Vt. 660, 660, 543 A.2d 1319, 1320 (1988); *In re Telesystems, Corp.*, 143 Vt. 504, 511, 469 A.2d 1169, 1172 (1983). In reviewing those orders, we give great weight to the Board's interpretations of its own regulations. See *In re Hydro Energies Corp.*, 147 Vt. at 574, 522 A.2d at 242. We accept findings of fact adopted by the Board unless they are clearly erroneous. 30 V.S.A. § 11(b). In reviewing such findings, we give great deference to the particular expertise and informed judgment of the Board. *Telesystems*, 143 Vt. at 509, 469 A.2d at 1172; *In re Green Mountain Power Corp.*, 131 Vt. 284,

303, 305 A.2d 571, 589 (1973). The burden of proving that findings and conclusions of the Board are clearly erroneous falls to the appealing party. *Village of Lyndonville*, 149 Vt. at 660, 543 A.2d at 1320. Moreover, this Court will not interfere with the performance of an administrative duty absent abuse of discretion. *Hall v. Department of Social Welfare*, 153 Vt. 479, 484, 572 A.2d 1342, 1345 (1990). It is against these standards of review that we consider EGC's claims on appeal.

## I.

EGC first argues that it was entitled to the rates in Docket 5177 when it tendered the contract between it and VPX obligating it to produce power. It relies on our holding in *In re Department of Public Service*, 157 Vt. 120, 125, 596 A.2d 1303, 1306 (1991) (the *Ryegate* decision), where we held that avoided-cost rates adopted pursuant to Rule 4.100 are available as a matter of federal law to qualifying facilities that incur a "legally enforceable obligation" for the delivery of power. Federal regulations establish a qualifying facility's right to avoided-cost rates once it is committed to "provide energy or capacity pursuant to a legally enforceable obligation." 18 C.F.R. § 292.304(d)(2). That rate may be calculated either at the time of delivery or at the time the obligation is incurred. *Id.* This law, EGC argues, precludes the Board from depriving EGC of the rates in Docket 5177.

EGC's argument finds support in FERC's comments, issued with the promulgation of regulations under PURPA, which state in part:

> [These regulations] are intended to reconcile the requirement that the rates for purchases equal the utilities' avoided cost with the need for qualifying facilities to be able to enter into contractual commitments based, by necessity, on estimates of future avoided costs. . . . The Commission does not believe that the reference in the statute to incremental cost of alternative energy was intended to require a minute-by-minute evaluation of costs which would be checked against rates established in long term contracts between qualifying facilities and electric utilities. . . . The import of this section is to ensure that a qualifying facility which has obtained the certainty of an arrangement is not

deprived of the benefits of its commitments as a result of changed circumstances.

45 Fed. Reg. 12,224 (1980). The Board, EGC argues, violated federal law by depriving EGC of the benefits of its agreement with VPX based on "changed circumstances."

EGC's argument is flawed because, as the Board concluded, neither the federal statute nor the regulations require utilities to purchase power at a price above actual avoided cost. The federal regulations, in fact, make clear that no electric utility is required "to pay more than the avoided cost for purchases." 18 C.F.R. § 292.304(a)(2). In this case, EGC applied for levelized, long-term rates that would result in payments well above avoided cost during the early years of operation. As the Board stated, "[t]hese preferential rates are offered only on a discretionary basis to encourage development of projects that meet Vermont's rigorous economic, environmental and reliability criteria, as established by the Vermont legislature. Project developers seeking [long-term levelized rates] therefore must demonstrate compliance with the substantive criteria of [30 V.S.A. §] 248(b)."

■ The Board was not insensitive to EGC's understandable desire to be able to rely on the guaranteed availability of adopted avoided-cost rates. The Board noted, however, that its paramount obligation is to ensure that Vermont's ratepayers are not burdened with uneconomical power purchases. The Board also expressed its realization that avoided-cost rates become outdated with time and market changes. As the Board stated, current market conditions "must remain the ultimate test of whether a proposed power sale (particularly one that is mandatory for the utilities under federal and state law) is in the general good of the state." Small power producers and cogenerators, the Board observed, are entrepreneurs seeking to benefit from changing market conditions and must also be prepared to face the risks associated with such changes. We find no error in the Board favoring concern for ratepayers over concern for return on the investment of entrepreneurs where, as here, the proposed project seeks rates higher than those mandated by federal law.

■ The court in *Snow Mountain Pine Co. v. Maudlin,* 84 Or. App. 590, 600, 734 P.2d 1366, 1371 (1987), a case relied upon

534

by EGC for its contention that it is entitled to Docket 5177 rates, also recognized that federal law did not entitle qualifying facilities to rates above actual avoided cost: "We conclude that the rate for purchase is to be based on [the utility's] *actual* 'avoided costs' and that the schedules of 'avoided costs' on file do not necessarily reflect actual costs and are not binding." (Emphasis in original.)

We find no error in the Board's conclusion that EGC's request required prior Board approval. It does not contravene either federal statute or regulation, and is not inconsistent with our holding in *Ryegate*. The agreement between EGC and VPX, assuming it was a "legally enforceable agreement," entitled EGC to receive avoided-cost rates as mandated by federal law, not preferential long-term levelized rates. We need not, therefore, reach the arguments advanced by CVPS and DPS that the agreement was without legal effect. Even if it were enforceable, the agreement could not, by itself, entitle EGC to the rates it sought.

## II.

■ The second issue, closely related to the first, is whether federal law preempts state review of the "economic benefits" of contracts between qualifying facilities and VPX based on levelized, long-term rates. EGC argues that it does. We conclude that it does not.

Both PURPA and its implementing regulations emphasize that the rates paid by utilities for output from qualifying facilities "shall be just and reasonable to the electric consumers of the electric utility and in the public interest." 16 U.S.C. § 824a-3(b)(1); 18 C.F.R. § 292.304(a)(1)(i); see also *In re Vicon Recovery Systems*, 153 Vt. at 545, 572 A.2d at 1358 (PURPA fosters a favorable economic climate for small power producers, but also recognizes countervailing considerations of public interest). Congress left implementation of PURPA to the states, 18 C.F.R. § 292.401, and we see no better means of fulfilling the federal objective than by subjecting requests for long-term levelized rates to stringent review in accordance with 30 V.S.A. § 248. The assessment of "economic benefit" under § 248(b)(4) ensures that the rates will be "just and reasonable" to Vermont ratepayers.

The Board's rules, the order issued with Docket 5177, and the VPX contract all provided clear and ample notice to EGC that both long-term and levelized rate requests are subject to § 248 review. Rule 4.104(H) states that "long-term rates and levelized rates shall be available only to qualifying facilities which have been found by the Board, after due hearing, to satisfy the substantive criteria of 30 V.S.A. § 248(b)." In the order issued with Docket 5177, the Board noted that contracts based on its rates "must satisfy the requirements of Rule 4.100." Furthermore, the power purchase agreement executed by VPX and EGC, a standard form used by VPX in all contracts for the purchase of power from qualifying facilities, clearly states that the agreement shall become effective only "after approval by the Board." Finally, the escrow agreement utilized in this case indicates that Board approval of the contract is required. It states: "producer agrees that if its project is disapproved by the Board, the purchase agreement . . . will become null and void."

We find no error in the Board's § 248 review of the agreement between VPX and EGC. That review furthered the federal objective of ensuring that the rates be just and reasonable to electric consumers. EGC had extensive notice that its proposed project would need a certificate of public good, which requires clearing § 248 review. Although the Board concedes that federal law precludes review of the economic benefits of projects seeking short-term, nonlevelized avoided cost rates, it properly followed both federal and state law, as well as its own rules, in this case.

### III.

EGC also challenges the authority of the Board to review its proposed rates in accordance with § 248 on the grounds that such review amounted to a collateral attack of matters previously decided when the Board adopted rates in Docket 5177. That review, EGC argues, violated principles of res judicata, collateral estoppel, and waiver, and contravened the Board's own orders and precedent. We agree with the Board's conclusion that § 248 review, although inextricably tied to the contract price, did not readjudicate issues addressed in the rate-setting process.

Under Rule 4.100, the Board has responsibility for approving or modifying avoided-cost rates submitted by the DPS.

4.104(E). The Board also, however, has responsibility for reviewing requests for long-term, levelized rates under § 248. 4.104(H). These separate provisions make clear that, in the Board's view, § 248 review does not involve issues identical to those confronted in estimating and setting avoided costs. The Board, in this case, expressly recognized that a developer was entitled to apply for Docket 5177 rates, but could not receive long-term levelized rates without prior approval by the Board.

The hearing officer discussed the relationship between Docket 5177 rates and § 248 review:

> The purpose of [rate-setting analysis] was to determine what utility power costs would be avoided when [qualifying facility] power is purchased within the time frame for which the rates were set. They do not and cannot supplant the inquiry required under Section 248(b)(2).
>
> . . . .
>
> I rejected attempts to permit relitigation of Docket 5177 issues in this case . . . . However, in my view the dictates of Section 248(b)(4) ultimately should serve as a safeguard to ensure that the Board's determinations on how [qualifying facility] power should be priced are reevaluated in light of market conditions at the time the proposed plant's Section 248 petition and VPX contract are submitted for Board approval.

We find no error in this interpretation of the Board's responsibilities under Rule 4.100. The Board had to decide whether EGC's proposed project, at the requested rates, would provide needed power and economic benefit to the State of Vermont. Those particular issues were not, and could not have been, adjudicated at a rate-setting hearing, and the Board was not precluded by collateral estoppel, res judicata, or waiver from fulfilling its responsibilities under state law.

EGC mischaracterizes the Board's denial of its application for a certificate of public good as a collateral attack on Docket 5177 rates. The Board did not seek to supersede, overturn, or otherwise invalidate its adopted rate structure in the EGC proceeding. Rather, it concluded that EGC's request for levelized long-term rates, based on that structure, did not meet the criteria of § 248(b). The Board could not fulfill its responsibility un-

der that statute without considering the price of output from EGC's proposed project. Analysis of need and economic benefit under § 248(b)(2) and (4), as the Board recognized, requires the Board to weigh the cost of a proposed project against its likely benefits.

We find no merit in EGC's argument that the Board's decision in this case violated its orders in other cases and was therefore arbitrary and capricious. EGC relies principally on two dockets of the Board, neither of which directly contradict its order here. In *In re Department of Public Service*, Docket No. 5191, at 20 (August 26, 1987), the Board wrote that it had "purposely sought to establish a stable basis on which qualifying facility developers could rely. In particular, we have deemed it critical that the risks—at least the regulatory risks—faced by developers be defined as precisely as possible." EGC argues that the Board's order in the instant case violates that order. We agree with DPS, however, that the language quoted addresses the definition of risk, not its elimination. In that case, the Board went on to state that certain risks remain for developers after the adoption of avoided-cost rates, among them the fact that "approval of a purchase and sale agreement is dependent upon the developer's showing that its project satisfies the substantive criteria of 30 V.S.A. § 248(b)." *Id.* at 21. In subjecting the EGC proposal to § 248 review, the Board did not stray from this earlier statement concerning alternative energy development.

EGC relies on statements by the hearing officer in *In re Ball Mountain Dam Hydro-Electric*, Docket No. 5172, at 2–3 (March 5, 1987), for the proposition that developers may rely on adopted rate schedules and that those rates may not be collaterally attacked in § 248 proceedings. In that case, the officer wrote that "[p]arties must be able to rely on the final order of the Board, and not forever wonder if each change in circumstance may permit a collateral attack." However, the officer in that case also recognized that "[t]he criteria of Section 248 were incorporated into Rule 4.100 so that undesirable projects could be denied favorable rate treatment" and that the Board continued to have review authority over requests for levelized and long-term rates. *Id.* In the EGC case, the Board did no more than fulfill its responsibility under Rule 4.100 to review the re-

quested levelized, long-term rates in accordance with § 248. We find no inconsistency.

EGC argues that the Board was "arbitrary and capricious" in denying its request because a hearing officer in another case recommended that the Board approve a different project seeking Docket 5177 rates. This argument deserves little attention. Each application for a certificate of public good and contract approval must stand on its own merits. Regardless of how many other projects satisfy the criteria of 30 V.S.A. § 248(b), EGC had its own burden of meeting the requirements of the statute. This it failed to do.

EGC also argues that the Board, in its analysis of need and economic benefit under § 248(b), erred when it considered the cost of power from Hydro Quebec, an uncommitted resource at the time of the hearing. We cannot conclude that this was error. The Board is often called upon to make projections based on uncertain data, and we defer to its expertise and informed judgment. See *Telesystems*, 143 Vt. at 509–10, 469 A.2d at 1172. Furthermore, consideration of possible power from Hydro Quebec was but one of many factors relied upon by the Board in this case. In concluding that the power from EGC was not needed, the Board relied on findings by the hearing officer that committed sources served to preclude the need for power from EGC's proposed facility at least through 1998. The officer noted that committed resources included a mix of nuclear facilities, coal facilities, existing Hydro Quebec contracts, small power projects, in addition to various oil, gas, and wood-fueled sources.

## IV.

EGC's final argument is that it had "vested rights" in Docket 5177 rates. We addressed the issue of whether a qualifying facility enjoyed vested rights in avoided-cost rates in our *Ryegate* decision. We held that "[w]e will not apply vested rights doctrine to change the [PURPA] equation to expand private rights at the expense of an added public burden." 157 Vt. at 127, 596 A.2d at 1307. As in that case, the overriding issue here "is whether we can require electricity consumers to pay rates above those established by the marketplace to protect the producer's investment in facilities and development costs." *Id.* We see no reason to depart from our holding in Ryegate in this case.

In conclusion, the Board properly followed federal law, state law, and its own rules in reaching the conclusion that output from the proposed EGC project was not needed at the requested rates and that the project would not provide an economic benefit to Vermont. That conclusion is well supported by numerous findings, which are in turn supported by the record.

*Affirmed.*

**Morse, J.,** concurring. I agree with the Court's result but believe it rests on an incorrect ground. The parties raised the issue of whether EGC's agreement with VPX was a legally enforceable obligation to produce power, entitling it to Docket 5177 rates. The Court needlessly sidesteps this familiar issue, recently addressed in *In re Department of Public Service (Ryegate)*, 157 Vt. 120, 125, 596 A.2d 1303, 1306 (1991), and instead embarks on a remarkable interpretation of avoided cost.

Avoided cost is the central concept in the PURPA scheme, and FERC regulations—not state law—define the term. See 18 C.F.R. § 292.101(b)(6) (1991) (avoided costs are "the incremental costs to an electric utility of electric energy or capacity or both which, but for the purchase from the qualifying facility . . ., such utility would generate itself or purchase from another source"). Although FERC regulations place implementation of PURPA in the state's hands, see 18 C.F.R. § 292.401(a), the state is not free directly or indirectly to redefine avoided cost. Instead, the state's role is to calculate (DPS) and approve (PSB) the rates utilities pay for power that qualified producers generate based on avoided cost. *Ryegate*, 157 Vt. at 122, 596 A.2d at 1304.

Under FERC regulations, again as a matter of federal law, the power producer has the option of choosing avoided costs either at the time of delivery or at the time the obligation is incurred. The rates are calculated over time, in Docket 5177 as long as thirty years, and the producer is entitled to the rates "over a specific term." 18 C.F.R. § 292.304(d)(2). If EGC's agreement with VPX is a legally enforceable obligation and if Docket 5177 was the most recent DPS/PSB rate order at the time of that agreement, EGC should be entitled to choose from those rates.

I find no federal authority for ignoring the Docket 5177 rates, which were the result of a prolonged administrative and quasi-

judicial process, or for recalculating new rates for this appellant. I also find unsatisfactory the Court's after-the-fact attempt to justify this procedure by distinguishing short-term and long-term avoided costs and levelized and nonlevelized rates based on avoided costs. These distinctions do not appear in PURPA, FERC, or the Board's own regulations. Although I did not agree with the result in *Ryegate*, at least that decision held out some expectation to power producers that they could rely on offered rates if they were willing to legally obligate themselves.

Comparing the facts in this case against the requirement for a certificate of public good would convince even a novice in this regulatory field that the certificate for EGC was not in the public good. The benefit of EGC's bargain would undoubtedly be at the public's expense. The Court's analysis is a curious, and I believe disingenuous, way to reach an affirmance in this case.

*Ryegate* is ample authority to affirm the Board because the "obligation" here is no more "enforceable" than the one there. As stated in *Ryegate*, 157 Vt. at 125, 596 A.2d at 1306: "At best, Ryegate has obligated itself to go through a number of development and regulatory steps that may lead to an obligation to deliver energy, if all goes well." This case is no different. I question why the Court does not apply this precedent, affirm, and be done with it. Instead, the Court necessarily violates *Ryegate* by analyzing this case as one not involving "avoided costs." The rates in this case are avoided costs by definition, and *Ryegate* teaches that avoided costs, as approved by the Board (as these were in Docket 5177), are "available *as a matter of federal law*" when and if the qualifying facility [here EGC] "incurs 'a legally enforceable obligation for the delivery of energy or capacity *over a specified term.*'" 157 Vt. at 125, 596 A.2d at 1306 (quoting 18 C.F.R. § 292.304(d)(2)) (emphasis added).

Levelization, which seems to be the linchpin of the Court's decision, does not undermine the existence of avoided costs any more than short-term or long-term rates do. Avoided costs are calculated over the short and long term, and rates based on avoided costs may be levelized or nonlevelized. Levelization merely flattens the payments—more now, less later. Once rates are calculated on avoided costs, how does levelization cause those rates no longer to be based on avoided costs? The Court's

opinion begs that question, because the answer must be, "Because we say so."

The Court simply cannot make the Board's magic (turning avoided costs into something else by levelization) real by incanting that "[the Board's] paramount obligation [is] to ensure that Vermont's ratepayers are not burdened with uneconomic power purchases." The Court today nullifies federal law by reading out "specified term" in the federal regulation as applying to avoided costs. While the end may be worthy, a "sleight of word" does not dignify the means.

Although the Court recognizes that the PURPA scheme leaves power producers open to financial risks resulting from unforeseen changes in economic circumstances, it refuses to acknowledge that the state and the consumers it represents are vulnerable to the same risks. PURPA was designed to encourage small power producers. If that policy goal is no longer desirable, the change should come through federal legislation.