2006 VT 69

## In re Petitions of Vermont Electric Power Company, Inc. and Green Mountain Power Corporation

[895 A.2d 226]

No. 05-164

Present: Reiber, C.J., Skoglund and Burgess, JJ., and Gibson, J. (Ret.) and Bryan, Supr. J. (Ret.), Specially Assigned

Opinion Filed March 10, 2006

*Joseph S. McLean* and *Robert E. Fletcher* of *Stitzel, Page & Fletcher, P.C.*, and *Thomas A. Little* of *Little & Cicchetti, P.C.*, Burlington, for Appellant Town of Shelburne.

*James A. Dumont*, Bristol, for Appellants Town of New Haven, Town of Middlebury and Addison County Regional Planning Commission.

*David L. Grayck* of *Cheney, Brock & Saudek, P.C.*, Montpelier, for Appellant Meach Cove Real Estate Trust.

*Aaron Adler* and *Dixie Henry*, Special Counsel, Montpelier, for Appellee Department of Public Service.

*Kimberly K. Hayden* and *Elijah D. Emerson* of *Primmer & Piper, P.C.*, St. Johnsbury, for Appellees Vermont Electric Power Company and Green Mountain Power Corporation.

¶ 1. **Skoglund, J.** In this case we consider three appeals from a Public Service Board order granting a certificate of public good for a proposal by Vermont Electric Power Company (VELCO) and Green Mountain Power (GMP) to construct a series of electric transmission upgrades known collectively as the Northwest Reliability Project. Appellants the Town of New Haven, the Town of Middlebury, and the Addison County Regional Planning Commission[1] jointly contend the Board erroneously: (1) approved a 345-kilovolt (kv) transmission line for a portion of the project instead of a less intrusive but allegedly adequate 115-kv line; (2) misstated and ignored relevant evidence concerning electromagnetic fields generated by the 345-kv transmission line; (3) failed to consider a proposal to underground the line in an environmentally sensitive location in the Town of New Haven; and (4) prejudiced landowners in future eminent domain proceedings by approving VELCO's specific plans. Appellant Town

---

[1] For ease of reference, we refer to these three parties collectively as "New Haven" throughout this decision.

of Shelburne (Shelburne) claims that the Board improperly failed to: (1) identify a specific southerly route for the proposed transmission line through the Town; (2) address the aesthetic impacts of the proposed line; (3) consider land conservation measures in the Town plan; and (4) make a final determination of VELCO's responsibility to underground a portion of the line. Appellant Meach Cove Real Estate Trust (Meach Cove) argues that the Board violated statutory requirements and settled case law by: (1) mandating a specific route for the proposed transmission line over its property; (2) depriving it of the opportunity to contest key issues in future eminent domain proceedings; (3) denying its request for a declaration that issuance of the certificate of public good will not have a preclusive effect in subsequent eminent domain proceedings; and (4) failing to consider alternative sites for construction of the proposed line. For the reasons set forth below, we affirm the Board's decision.

¶ 2. In June 2003, VELCO and GMP (hereafter, collectively "VELCO") filed petitions with the Board seeking a certificate of public good (CPG) for a set of transmission upgrades in the northwestern portion of the state. See 30 V.S.A. § 248(a) (providing that no electric company may begin site preparation or construction of electric generation or transmission facility, or exercise the right of eminent domain in connection therewith, unless the Board "first finds that the same will promote the general good of the state and issues a certificate to that effect"). In its petition, VELCO asserted that projected increases in electric demand in northwestern Vermont, measured against certain national and regional operating standards, made it imperative to strengthen the transmission grid serving the area in order to maintain desirable levels of reliability. To this end, VELCO proposed five basic upgrades: (1) the construction of a new 35.5-mile, 345-kv transmission line from West Rutland to New Haven, parallel to an existing 115-kv line passing through a number of towns, including appellants Middlebury and New Haven; (2) replacement of existing 34.5-kv and 46-kv subtransmission lines with a new 27-mile, 115-kv line between New Haven and South Burlington passing though portions of several additional towns, including appellant Shelburne; (3) the reconductoring of VELCO's existing 5.6-mile, 115-kv transmission line between Williamstown and Barre; (4) upgrades to, or reconstruction of, a number of substations throughout the northwest region; and (5) construction of a new substation and associated 1.6-mile subtransmission line in Vergennes.

¶ 3. During thirty-seven days of public and technical hearings that spanned most of a year, the Board took extensive and wide-ranging testimony and documentary evidence concerning the project from expert and lay witnesses representing several dozen parties. See *id.* § 248(a)(4) (requiring the Board to hold both "nontechnical" public hearings in counties affected by the proposal and "technical" hearings at locations of its choice). The hearings addressed both general and site-specific issues relating to the statutory criteria for issuance of a CPG under § 248(b), including the project's consistency with "land conservation measures" contained in local municipal plans, *id.* § 248(b)(1); its necessity to meet present and future demand for service that could not otherwise be met "in a more cost effective manner through energy conservation programs and measures and energy-efficiency and load management measures," *id.* § 248(b)(2); its "economic benefit to the state and its residents," *id.* § 248(b)(4); and whether it would "have an undue adverse effect on esthetics, historic sites, air and water purity, the natural environment and the public health and safety, with due consideration having been given to" several of the statutory criteria for protection of the environment set forth in Act 250, *id.* § 248(b)(5). Appellants participated actively in the hearings, offering evidence to support their views on the best means to protect the aesthetic, health, environmental, and economic interests of their communities.[2]

¶ 4. At the conclusion of the process, the Board issued a written order spanning over 240 pages, including appendices, and containing over 640 findings in support of its conclusions. In brief, the Board determined that: the current bulk transmission system fails to meet reliability standards; the proposed project will enable the system to satisfy Vermont's reasonably projected reliability needs; and "there is no cost-effective alternative to the proposed Project that is reasonably assured of timely implementation."[3] While finding that

---

[2] Meach Cove, representing landowners affected when VELCO submitted a modification to the petition to reroute a portion of the line through Shelburne, was granted permissive intervention after the initial series of public and technical hearings. The Board held supplementary public and evidentiary hearings in response to the rerouting proposal in which Meach Cove was a participant.

[3] The Board noted its concern, however, that deficiencies in VELCO's planning process and lack of long-term focused attention on efficiency efforts had narrowed the Board's options in considering alternatives to the project proposal. The Board announced, in response, that it planned to open a separate investigation into VELCO's forecasting

the project will have adverse aesthetic impacts in certain areas, the Board concluded that mitigation measures, such as careful pole placement, screening, the relocation of the New Haven substation, and undergrounding the line in at least one location in Shelburne, will ensure that the impact is not undue. With respect to health and safety concerns, the Board heard substantial testimony and reviewed numerous studies concerning electric and magnetic field (EMF) exposure. The Board concluded that the scientific evidence of any health risk was weak to nonexistent and provided no justification for imposing significant mitigation measures, such as undergrounding the line. Nevertheless, as part of the post-certification process, the Board ordered VELCO to identify areas of relatively high EMF levels near residences and propose measures to mitigate exposure at those locations, and to monitor and regularly report to the Board the scientific evidence regarding the health effects of EMF.

¶ 5. In short, the Board concluded that, with certain enumerated conditions and alterations, the project would promote the general good of the state "without undue adverse impacts on Vermont's natural and built environment and without presenting a risk to Vermonters' health and safety." Consistent with these findings, the Board issued a CPG containing twenty separate conditions, including a graduated post-certification process that will require: (1) the identification of areas of high EMF levels near residences, together with measures to mitigate the exposure of those residences; (2) the filing of detailed construction plans, with associated environmental mitigation measures as identified in the Board's order; (3) the filing of all required zoning, construction, and other permits with the Board; and (4) a showing that consideration has been given to all measures identified in the Board's order for the mitigation of adverse aesthetic impacts. Meach Cove and New Haven filed separate motions to alter or amend the order, and VELCO filed a request for clarification. The Board ordered several relatively minor language changes and clarifications to the decision, but otherwise denied the motions. Separate appeals by New Haven, Shelburne, and Meach Cove followed. We address each in turn.

---

abilities and to explore ways to ensure that cost-effective, nontransmission alternatives are adequately considered and implemented in the future.

I.

¶ 6. We note at the outset the limited nature of our review. "In a § 248 proceeding, the Board 'is engaged in a legislative, policy-making process.'" *In re Twenty-Four Vt. Utils.*, 159 Vt. 339, 357, 618 A.2d 1295, 1306 (1992) (quoting *Auclair v. Vt. Elec. Power Co.*, 133 Vt. 22, 26, 329 A.2d 641, 644 (1974)). The Board must employ "its discretion to weigh alternatives presented to it, utilizing its particular expertise and informed judgment." *Id.* We "give great deference" to that expertise and judgment and accord a "strong presumption" of validity to the Board's orders. *In re E. Georgia Cogeneration Ltd. P'ship*, 158 Vt. 525, 531, 614 A.2d 799, 803 (1992). Findings of fact adopted by the Board to support its decision must be accepted by the Court unless they are shown to be clearly erroneous. *Id.* "The burden of demonstrating clear error is the appellant's, and that burden is not a light one." *In re Adelphia Bus. Solutions of Vt., Inc.*, 2004 VT 82, ¶ 7, 177 Vt. 136, 861 A.2d 1078.

¶ 7. With these standards in mind, we turn first to New Haven's claims on appeal. New Haven contends principally that the Board erred in approving VELCO's proposal to construct a new 345-kv line from West Rutland to New Haven parallel to an existing 115-kv line, instead of approving a second 115-kv line along the same route. The record discloses that the Board considered a number of "transmission-only alternatives" to the VELCO proposal, including the second 115-kv line, and engaged in a comparative analysis of this and other transmission options. The Board concluded that the 115-kv alternative was inferior to the VELCO proposal for several reasons. First, it noted that the 115-kv alternative provided less capacity than the 345-kv line to protect against a potential voltage collapse resulting from contingencies elsewhere in the transmission system. Second, the 115-kv alternative would produce significantly higher "impedance," or conductive losses and inefficiency, than the 345-kv line. Third, the 115-kv line would require adding a second, sixteen-mile, 115-kv line from Williamstown to Middlesex to increase the reliability of the alternative to the same reliability as the 345-kv proposal, with associated potential environmental impacts to this additional transmission corridor. Finally, the Board found that the 115-kv line would not be compatible with VELCO's long-term expansion plans for extending 345-kv lines from New Haven to Williston and to a future substation in Essex.

¶ 8. The Board recognized that the transmission poles required for a 345-kv line would be higher, and the right-of-way wider, than those

required for a 115-kv line, and found that these requirements would create adverse aesthetic effects at several locations along the route. The Board further found, however, that any undue impacts could be avoided through a variety of site-specific mitigation measures, including pole placement, planting of hedgerows and trees, and relocation of the line in certain areas, and ordered VELCO to incorporate these mitigation measures into the project.

¶ 9. Despite these findings, New Haven contends the Board erred in failing to conduct a more detailed comparison between the environmental and aesthetic impacts of the 345-kv proposal and the 115-kv alternative. This argument is unpersuasive. Under the two-part "*Quechee* test" utilized by the Board and approved by this Court for reviewing issues of aesthetics under § 248(b), a determination must first be made as to whether a project will have an adverse impact on the aesthetics and the scenic and natural beauty of an area. *In re Halnon*, 174 Vt. 514, 515, 811 A.2d 161, 163 (2002) (mem.). If the answer is in the affirmative, the inquiry advances to the second prong — whether the impact would be "undue." *Id.* This is determined by assessing whether it violates a clear community standard, it offends the sensibilities of the average person, or the applicant has failed to take generally available mitigating steps that a reasonable person would take to improve the harmony of the proposed project with its surroundings. *Id.*

¶ 10. New Haven argues that the Board deviated from this standard, citing our decision in *Halnon*, where we upheld a decision by the Board to deny a CPG for a proposed wind turbine based, in part, on the applicant's failure to take adequate steps to mitigate the adverse impact on a neighbor's view or analyze alternative sites that would have provided more effective screening. *Id.* at 517, 811 A.2d at 165. The record here is markedly different. VELCO proposed a number of measures to mitigate the adverse aesthetic effects of the 345-kv line, and the Board found that these and other supplemental mitigation measures would negate any undue impacts from the line. Furthermore, unlike in *Halnon*, where the applicant provided no evidence to support his claim that alternative locations would cause ancillary problems undermining the project, *id.*, VELCO here adduced substantial evidence that the 115-kv line would not adequately accomplish the project's goal of providing long-term and reliable energy sufficiency, and the Board so found. Accordingly, we find no legal or factual basis to conclude that the Board abused its

discretion by failing to conduct an adequate comparative analysis of the 115-kv alternative.[4]

■ ¶ 11. New Haven also specifically challenges the Board's reliance on evidence that the 115-kv alternative would not be compatible with VELCO's long-term plans for extending the proposed 345-kv line from New Haven to Williston and to a future substation in Essex, asserting that it was error to rely on potential energy needs twenty years in the future. Forecasting future energy needs and the optimal means of addressing those needs, however, falls squarely within the Board's informed judgment and expertise, and we discern no basis to conclude that the Board's finding in this regard was unreasonable or clearly erroneous. *In re E. Georgia*, 158 Vt. at 531-32, 614 A.2d at 803.

¶ 12. New Haven also claims that the Board abused its discretion in applying a least-cost analysis to the project as a whole, rather than to each separate project component, including the proposed 345-kv line and 115-kv alternative. See 30 V.S.A. § 248(b)(2) (stating that issuance of CPG requires finding that proposed purchase, investment or construction is required to meet present and future demand for service "which could not otherwise be provided in a more cost effective manner through energy conservation programs and measures and energy-efficiency and load management measures"); *id.* § 248(b)(4) (stating that CPG requires finding that proposal will result in economic benefit to the state and its people). The Board rejected this argument, noting that, in dealing with similar projects, it had consistently addressed the economic and least-cost criteria for the projects as a whole rather than for their separate line and substation components. The Board found this to be a reasonable approach where, as here, the applicant contends, and the evidence shows, that a project should be treated as a coordinated whole due to the interconnected nature of the system.[5] With respect to the 345-kv

---

[4] Although its argument is not separately captioned, New Haven appears to argue that there was no evidence to support the Board's finding that the addition of a second 115-kv line from Williamstown to Middlesex would have negative environmental effects, but Thomas Dunn, a VELCO project manager, testified specifically that this option "has additional environmental impacts because the right-of-way in the [Williamstown] to Middlesex corridor would likely need to be widened, and/or some present 34.5 kv lines would have to be moved or replaced."

[5] VELCO's experts described the Northwest Reliability Project as "a coordinated series of improvements to the VELCO transmission system designed to provide reliable

line, the Board specifically found that it was an integral component of the Northwest Reliability Project, and therefore did not require a separate cost-effective analysis.

¶ 13. Contrary to New Haven's claim, we discern nothing in the language of § 248 that is inconsistent with the Board's approach, or that specifically requires a component-by-component least-cost analysis of an integrated system-wide transmission upgrade. New Haven cites to a provision of the statute defining a natural gas facility as including "any natural gas transmission line," 30 V.S.A. § 248(a)(3)(A), but this section does not signal a clear legislative intent to subject virtually every proposed gas or electric transmission line or other project component to a separate least-cost analysis when it is part of an otherwise integrated project. As the Board's approach under § 248 was neither unreasonable nor contrary to the plain terms of the statute, and was well within the scope of its expertise, it must be upheld. See *In re Verizon New Eng. Inc.*, 173 Vt. 327, 334-35, 795 A.2d 1196, 1202 (2002) (recognizing that absent compelling indication of error, we will not disturb Board's interpretation of statutes within its particular area of expertise); *In re Twenty-Four Vt. Utils.*, 159 Vt. at 359, 618 A.2d at 1307 (rejecting claim that Board violated § 248(b) by conducting "statewide evaluation" of hydroelectric energy purchase contract rather than "utility-by-utility assessment," and holding that Board's approach under the statute was "reasonable"). New Haven also challenges the Board's predicate finding that the proposed thirty-five-mile, 345-kv line running through the Champlain Valley from West Rutland to New Haven constitutes an integral and essential part of a coordinated project to provide reliable energy to meet Vermont's current and future energy load levels. Again, however, the Board's finding was supported by the record evidence, and was within its area of expertise, and therefore must be upheld.[6] *In re E. Georgia*, 158 Vt. at 531, 614 A.2d at 803.

¶ 14. New Haven further contends the Board failed to consider relevant evidence, and misstated the evidence, concerning the health

transmission service to the [S]tate of Vermont," and as a combination of upgrades designed to "work together to supply" Vermont's projected peak energy needs.

[6] VELCO experts testified, for example, that all of the proposed upgrades, including the 345-kv line, were designed to "work together as one project to meet" Vermont's energy needs, and singled out the 345-kv line as "the single most important element in strengthening the system feeding northwest Vermont."

risks posed by increased EMF levels associated with the project. The Board's decision contains some forty findings reviewing the extensive testimony and scientific literature adduced by the parties on the subject of EMF's effect on the public health. This includes a 1999 report by the National Institute of Environmental Health Sciences, and a follow-up report in 2002, finding that "[t]he scientific evidence suggesting that ELF-EMF [extremely low frequency EMF] exposures pose any health risk is weak" and concluding that EMF exposure is not likely to pose any health hazard. The Board found that there was no evidence of any substantial linkage between EMF exposure and childhood leukemia or other cancer risks, nor any recorded case of medical-device disruption caused by power-line EMF. In the absence of evidence of any undue effect on the public health, the Board concluded that significant mitigation measures, such as undergrounding the line, were not required. Nevertheless, consistent with the policy of "prudent avoidance" followed by the Department of Health and other states, the Board ordered VELCO to continue to identify areas of relatively high EMF levels, propose options to mitigate exposure in those areas, and monitor the scientific literature and regularly report to the Board on these efforts.

■ ¶ 15. Of the Board's extensive findings in this area, New Haven has challenged only those concerning EMF's effect on medical devices, asserting that the Board ignored or misunderstood evidence that manufacturers routinely warn users of pacemakers, implantable cardioverter defibrillators, and insulin pumps that high-voltage lines may interfere with their devices, and consequently caution them to avoid such lines. The evidence showed, however, that the manufacturers' warnings were not based on studies demonstrating health risks to medical-device users from EMF generated by power lines, or documenting any single instance of such interference.[7] Thus, the evidence supported the Board's finding that EMF from power lines did not pose a tangible risk to medical-device users or require significant mitigation measures. We find no merit to

---

[7] Dr. Peter Valberg, an expert in this area, stated in this regard that

[d]espite the ubiquitous nature of public exposure to EMF from high-voltage transmission lines, no recorded cases of medical-device disruption by power-line EMF were identified either in the manufacturers' websites or in our analysis of available data. There are no FDA-issued safety alerts, public health advisories, [or] notices addressing potential medical device interference from power frequency EMF.

the claim that the Board ignored or misstated the evidence in this area, and no basis to disturb its findings.[8] *Id.*

 ¶ 16. New Haven next claims that the Board failed to consider expert testimony recommending burial of the proposed new 115-kv line running from a substantially expanded New Haven substation to the point where it crosses Route 17 in the Town of New Haven. The record does not support the claim. Although it did not specifically mention the Route 17 crossing, the Board considered the proposal to underground all or part of the new line and found that aesthetic considerations did not justify the cost of the underground option except in two specific locations in the Town of Shelburne. The Board did, however, reject VELCO's proposed mitigation measures as inadequate to negate the adverse aesthetic effects from the expanded substation and Route 17 crossing. Instead, it ordered VELCO to consider an option discussed by New Haven's expert landscape architect and planner, Jean Vissering, to relocate the expanded substation (at considerable additional cost) to allow for better screening. Vissering noted, and the Board found, that relocating the substation would facilitate relocating the Route 17 crossing to a lower elevation, which would mitigate its adverse visual impact. Although Vissering opined that undergrounding the line at the Route 17 crossing represented the optimal approach, and the Board chair wrote separately to endorse that view, the expert acknowledged that — if the Board determined the costs of undergrounding to be unreasonable — the relocation option would remove the major adverse aesthetic impacts of the original proposal. The Board's decision thus reveals a careful balancing of cost, aesthetic, and technical considerations well within its area of expertise, and well supported by the evidence. Accordingly, it may not disturbed. *Id.*

 ¶ 17. New Haven additionally contends the Board violated § 248 by approving specific locations for the proposed transmission lines. Nothing in the statute, however, prevents the Board from certifying that the proposal to construct additional transmission lines, substations, and other upgrades in specific locations serves the public good. The decisions on which New Haven relies, *Vt. Elec. Power Co. v. Bandel*, 135 Vt. 141, 145, 375 A.2d 975, 978 (1977),

---

[8] New Haven notes one inaccurate finding in the Board's decision concerning nonhealth-based standards for EMF exposure. The Board corrected the finding in response to New Haven's motion to alter. The corrected finding provides no basis to disturb the decision.

*Auclair v. Vt. Elec. Power Co.*, 133 Vt. 22, 28, 329 A.2d 641, 645 (1974), and *In re Vt. Elec. Power Co.*, 131 Vt. 427, 434-35, 306 A.2d 687, 691-92 (1973), held merely that the Board *may* certify a general rather than a specific transmission corridor and retain jurisdiction to review more detailed plans through a post-certification procedure. They do not hold that this approach is *required*. Accordingly, the claim lacks merit.

¶ 18. In a related argument, New Haven asserts that, by approving certain specific routes, the Board improperly precluded individual landowners from challenging the necessity of constructing the lines in later condemnation proceedings under 30 V.S.A. §§ 110-112. As we have explained, however, a § 248 certification proceeding "is a planning and policy determining [process] which forecloses no individual rights" and involves "no predetermination of the issue of necessity of condemnation for any particular route." *Auclair*, 133 Vt. at 26-27, 329 A.2d at 644-45. Accordingly, the claim lacks merit. Lastly, New Haven asserts that the Board's certification order violates the principle that findings should contain clear statements of fact and identify their basis in the record, rather than merely recite testimony or refer to unspecified portions of the record. As our previous discussion suggests, however, the Board's numerous and detailed factual findings were extensively supported by specific citations to the record evidence. Thus, we find no error.

## II.

¶ 19. We turn next to Shelburne's claims. Shelburne raises four issues on appeal. First, in an inversion of New Haven's earlier argument, Shelburne asserts that the Board's findings improperly fail to identify a *specific* route for a portion of the new transmission line through the Town. VELCO's original proposal was to replace approximately 5.6 miles of existing 34.5-kv transmission line within the Town with a new 115-kv transmission line to be constructed in the existing corridor, and to upgrade the existing substation. The southerly 2.4-mile segment of the line runs from the Charlotte border to the substation, passing a residential neighborhood known as Davis Park. The northern segment runs from the substation approximately 3.2 miles north. In response to concerns about the impact of larger transmission structures on the Davis Park neighborhood, VELCO filed an alternative proposal to shift a portion of the southerly route to the west, away from the neighborhood and onto the lands of the Meach Cove Trust. This reroute proposal raised

additional environmental and aesthetic concerns, which resulted in at least one additional reroute proposal, a variation on the second, that also affected the Meach Cove Trust property.

¶ 20. Shelburne asserts that the Board's findings concerning this portion of the southern segment are inadequate because, while it is clear that the Board implicitly rejected the original route, it is allegedly "difficult to determine" which of the alternative routes the Board approved. We find no error. As Shelburne acknowledges, references in the Board's findings to expert testimony concerning the potential aesthetic impacts of the line and the mitigation measures necessary to address those impacts leave no doubt that the Board chose the alternatives offered by VELCO over the original proposal. The Board's findings also suggest that the final location for this portion of the line was to be reserved for the post-certification process, as indicated in the following finding:

> This section of the 115 kv line is sufficiently sensitive that it must be planned on paper at a design detail level, and then confirmed in the field by a method of testing actual proposed pole locations to ensure that existing screening is used to the greatest effect possible. . . .

> VELCO must include the Town and affected landowners in this process, including the Meach Cove Real Estate Trust.

Pursuant to the post-certification process outlined in the Board's decision, the Board will review final design and construction plans submitted by VELCO showing specific locations for each transmission structure and outlining associated environmental mitigation measures. The Board will also conduct site visits as necessary, and afford Shelburne and other parties the opportunity to comment on the final plans, request a hearing, and submit additional evidence.

¶ 21. As previously discussed, we have long upheld the Board's authority to approve a general route for a proposed transmission line in a § 248 proceeding, reserving the resolution of difficult aesthetic and environmental considerations underlying the more specific decision to a post-certification procedure. *In re Vt. Elec. Power Co.*, 131 Vt. at 434-35, 306 A.2d at 691-92. We find nothing in the Board's decision here that is inconsistent with this approach or objectionable under the statute. Hence, there was no error warranting a reversal and remand.

¶ 22. Shelburne next contends the Board's findings fail to adequately address the aesthetic impacts of the proposed 115-kv transmission line along the one-mile section between Bostwick Road and Harbor Road, and the half-mile segment from the Bostwick Road Bridge to the Meach Cove Trust property. The Board addressed the aesthetic effects of the 115-kv line, both generally and on a section-by-section basis, under the *Quechee* test referred to above. The Board noted that for most of its length the 115-kv line will replace existing lines and will be constructed in existing transmission corridors, although wider rights-of-way will be required. The Board also noted the possibility of increased visibility resulting from the taller pole heights generally required by the new line. With respect to the Bostwick-Road-to-Harbor-Road section, however, the Board found that the use of shorter poles will mitigate the visual impacts on the Shelburne Museum and Shelburne Farms. As noted, the Board also observed that the final decision concerning proper pole placement and screening for this "sensitive" segment of the line would require more detailed planning and field testing. With respect to the half-mile segment from Bostwick Road Bridge to the Meach Cove Trust property, the Board found that the adverse aesthetic impacts resulting from the new line would be mitigated by a variety of measures, including the use of shorter poles, careful pole placement, retention of buffering trees, and the placement of additional vegetative screening.

¶ 23. Despite these findings, Shelburne contends that the Board's analysis was deficient under the *Quechee* test. We see no such shortcoming. As noted, the *Quechee* analysis requires the Board to determine whether a project will have an adverse aesthetic impact, and, if so, whether that impact is undue, i.e., whether it violates a clear community standard, it offends the sensibilities of the average person, or the applicant has failed to take reasonably available mitigating measures to improve the harmony of the project with its surroundings. *In re Halnon*, 174 Vt. at 515, 811 A.2d at 163. Shelburne argues that the Board failed to specifically address local community standards dedicated to the protection of viewsheds in these areas, but the Board's findings demonstrate that it considered the project's impact on views to be a critical concern, and further demonstrate that it was satisfied that the prescribed mitigation measures would effectively ameliorate these impacts. Shelburne also faults the Board for failing to address the line's effect on views from points other than the Shelburne Museum and Shelburne Farms, but

the record shows that Shelburne's own experts focused principally on these vantage points. Accordingly, we find no error.

¶ 24. Finally, Shelburne contends the Board mischaracterized the testimony of an expert landscape architect, David Raphael, in concluding that the adverse impacts along the segment of the line from Bostwick Road Bridge to the Meach Cove Trust property could be effectively mitigated. The expert's testimony fully supports the Board's finding.[9] Shelburne notes that the expert later qualified his testimony by acknowledging that "sufficient mitigation can be provided if all of those elements [pole placement, tree retention, additional screening] are explored to their fullest extent," and that this would remain uncertain until more detailed plans were in place. This does not, however, undermine the Board's finding, but rather is consistent with its conclusion that final approval must await a post-certification review of detailed site-specific plans for the location of transmission structures and associated mitigation measures.

¶ 25. Shelburne next asserts that the Board misinterpreted its statutory obligation to find that any new construction of an in-state facility "will not unduly interfere with the orderly development of the region with due consideration having been given to the recommendations of the municipal and regional planning commissions, the recommendations of the municipal legislative bodies, and the land conservation measures contained in the plan of any affected municipality." 30 V.S.A. § 248(b)(1). As the Board observed, this Court has construed the phrase "due consideration" in § 248(b)(1) to "at least impliedly postulate[] that municipal enactments, in the specific area, are advisory rather than controlling," *City of S. Burlington v. Vt. Elec. Power Co.*, 133 Vt. 438, 447, 344 A.2d 19, 25 (1975), and Shelburne takes no issue with this interpretation. Shelburne challenges the Board's corollary conclusion, however, that "land conservation measures" must be interpreted to mean measures specifically "directed toward land conservation, and not general policy state-

---

[9] In his prefiled testimony, Mr. Raphael analyzed the proposed mitigation measures for this segment as follows:

> While the upgrade as proposed will result in an adverse impact, mitigation measures such as careful pole placement, lower pole heights, retention of as much vegetation at the edge of [the] corridor as possible, presence of background vegetation and other landscape elements in the corridor, as well as proposed plantings, provide sufficient mitigation to avoid an undue adverse impact in this section.

ments that apply indiscriminately throughout the municipality." The Board relied, in this regard, on our decisions holding that the Act 250 requirement of "conformance with any duly adopted local or regional plan," 10 V.S.A. § 6086(a)(10), requires a "specific" municipal policy rather than "broad goals lacking in specific policies or standards." *In re John A. Russell Corp.*, 2003 VT 93, ¶¶ 16, 19, 176 Vt. 520, 838 A.2d 906 (mem.); accord *In re Kisiel*, 172 Vt. 124, 130, 772 A.2d 135, 140 (2000); *In re Molgano*, 163 Vt. 25, 31, 653 A.2d 772, 775 (1994).

¶ 26. Shelburne argues that while the requirement of "conformity" under Act 250 may warrant specificity in local plans, the fact that land conservation measures in a § 248 proceeding are only advisory suggests that the Board should consider a municipal plan's broad "vision" for development rather than apply the more exacting standard under Act 250. VELCO and the Public Service Department argue, in response, that this Court generally defers to the Board's interpretation of an enabling statute within its particular expertise, and that Shelburne has identified no "compelling indication of error" in the Board's approach. *In re Vt. Yankee Nuclear Power Station*, 2003 VT 53, ¶ 5, 175 Vt. 368, 829 A.2d 1284. Although the issue is well framed and significant, we find that there is no need to address it here. While Shelburne takes issue with the Board's narrow definition of "land conservation measures," it does not argue that it was prejudiced by the Board's interpretation, or explain how, if at all, a broader approach would have changed the result. See *Mellin v. Flood Brook Union Sch. Dist.*, 173 Vt. 202, 216, 790 A.2d 408, 421 (2001) (holding that we need not overturn trial court ruling where it did not harm the plaintiff and its resolution would not alter the outcome).

¶ 27. We note, furthermore, that despite its ruling the Board did effectively address the Shelburne town plan and found no evidence that the replacement line in Shelburne — to be constructed almost entirely within the existing utility corridor — would cause or prevent additional development not in conformity with the Town's bylaws, and Shelburne has not challenged this finding. The Board also expressly found that nearly all of the general goals and objectives in Shelburne's town plan dealing with land conservation, aesthetics, and visually significant areas had been addressed by the Board in its analyses of the various other criteria of § 248. Thus, we find no basis to disturb the Board's ruling.

¶ 28. Finally, Shelburne contends the Board abused its discretion in authorizing VELCO to seek reconsideration of its decision requir-

ing the utility to underground a segment of the line along the Bay Road. The Board found that the area, located near Lake Champlain, was aesthetically sensitive, and that, although the line would be located in an existing transmission corridor, the taller poles would be difficult to screen and would be out of character with the lakeshore and its surrounding residential neighborhoods. Accordingly, it concluded that placing the line underground for approximately 1.3 miles of this segment was reasonable and necessary. The Board also recognized, however, that the undergrounding option entailed significant additional costs, and observed "that there may be as-yet unknown issues, such as archaeological resources, that would create some problems in placing the line underground in this area." Therefore, it determined that VELCO could request the Board to reconsider its decision and allowed VELCO the opportunity to "develop a significantly more creative alternative design for an overhead line than has been previously submitted that addresses our concerns."

¶ 29. Shelburne claims that the Board's decision subverts the normal Rules of Civil Procedure and principles of finality and collateral estoppel by providing VELCO with an open-ended authorization to seek reconsideration of the Board's ruling. We read the Board's decision more narrowly, however, as simply authorizing VELCO to revisit the ruling if, during the post-certification process of preparing and implementing feasibility studies and final design plans for location of the transmission structures, previously-unexplored problems or solutions present themselves at this particular location. As noted, we have authorized such a two-step approach for the certification process, *In re Vt. Elec. Power Co.*, 131 Vt. at 434-35, 306 A.2d at 691-92, and we find no infirmity in its application here.

### III.

¶ 30. Meach Cove raises four arguments on appeal. The first three all restate claims, previously discussed, that the Board exceeded its authority under § 248 in approving a specific route for the proposed transmission line, and that as a result the Board improperly prejudged issues more properly left to a post-certification condemnation proceeding under 30 V.S.A. §§ 110 and 112. As explained above, the arguments lack merit. *Supra*, ¶¶ 17-18.

¶ 31. Meach Cove's final contention is that the Board erred in approving VELCO's alternative proposal to route a portion of the southerly segment of the line in Shelburne over Meach Cove lands rather than approving the original route through Davis Park. Meach

Cove claims that, having determined that the alternative proposals would have certain adverse aesthetic impacts, the Board was obligated to consider the original route and explain why it was unacceptable, and it failed to do so. This claim is not supported by the record, which reveals that the parties adduced substantial evidence of adverse aesthetic impacts resulting from the original proposal.[10] The Board also concluded that the adverse effects from the Meach Cove rerouting proposal could be mitigated, although, as noted, it also reserved for the post-certification process final approval of detailed construction, placement, and mitigation plans. Thus, we find no error.

*Affirmed.*

---

[10] Landscape architect David Raphael testified, for example, that the original corridor "is located in a densely developed area with many residences, a school, a park, open space and other land uses," and that serious adverse impacts would accrue from higher poles and wider rights of way that would be offensive to a reasonable person.