King v. Bishop et. al., No. 131-4-12 Bncv (Wesley, J., Nov. 12, 2013).

[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

**STATE OF VERMONT**
**SUPERIOR COURT**

| | |
|---|---|
| **VERNON KING**<br>  **Plaintiff**<br><br>  **v.**<br><br>**Brian Bishop & Courtney Bishop**<br>  **Defendant** | **BENNINGTON UNIT, CIVIL DIVISION**<br>**Docket No. 131-4-12 Bncv** |

**FINDINGS OF FACT, CONCLUSIONS OF LAW**
**& ORDER**

At the trial to the court on Sept. 16, 17, and 24, 2013 on the merits of the complaint and counterclaims, Plaintiff Vernon King appeared self-represented. Defendants, Brian and Courtney Bishop, appeared and were represented by Patrick Bernal, Esq.

Count I of Plaintiff's complaint seeks damages for breach of a construction contract, invoking relief under the Vermont Prompt Payment Act. Count II seeks damages for conversion. Count III seeks damages for fraud. Count I of Defendants' counterclaim seeks damages under Vermont's Consumer Fraud Act. Count II seeks damages for defamation. Count III seeks damages for breach of contract. Count IV seeks damages for breach of express warranty.

At the close of the evidence, the Court allowed the parties until Oct. 4 to file post-trial memoranda and proposed findings. Based on the evidence at trial, the Court makes the following findings and conclusions.

**Findings of Fact**

1. In 2010, Mr. and Ms. Bishop owned a parcel of unimproved land in Wells, Vt. They contracted to place a modular home on the property. Knowing Mr. King had performed some carpentry for Mr. Bishop's father, they consulted with him regarding construction anticipated in connection with readying the modular home for their occupancy as their family's primary residence.
2. The Bishops understood that, after being delivered from the factory, the modular home would need completed siding, as well as soffits, facia, and a chimney. They also wished to have it appointed with a "farmer's porch." They met with Mr. King to discuss these projects.
3. Mr. King informed the Bishops that he was familiar with the installation of vinyl siding, and that he employed workmen experienced in that aspect of the construction trades. While Mr. King expected to supervise any construction, the parties understood that he would employ others to do the construction tasks due to his physical impairments.

4. Mr. King has been afflicted with muscular dystrophy since age 18. He is now 44 and has required the use of a wheelchair for the past six years. Within the past two years, he has been found eligible for social security benefits as a result of his disability.

5. For the purpose of Mr. King's preparation of an estimate, the Bishops provided him with a preliminary blueprint showing the dimensions of a model of a modular home similar to the one they expected to purchase. Ms. Bishop credibly maintains that Mr. King understood that the blueprint did not contain exact specifications representing the home as it would be actually installed.

6. On April 10, 2010, the parties executed a written contract prepared by Mr. King for "vinyl siding & farmer's porch." The "scope of work" described by the contract provided: "Contractor will install vinyl siding and metal trim for soffits & fascia on exterior of house & garage. Contractor will build a farmer's porch, 44 x 8, on front entry side of house. Farmer's porch will be built to plan specs. Home owners will supply vinyl siding, metal trim, and shingles for roof of farmer's porch. Home owners will be responsible for garbage, demo, scrap wood, etc. Contractors will supply materials for farmer's porch, decking, post, railing, wainscoting, spindles and steps and framework. Labor and materials are in this price."

7. The contract provided that the Bishops would pay Mr. King $10,000 for the work specified, payable as follows: "4,000 deposit, Halfway 3,000, Job Completion, 3,000." Mr. King included a 5 year warranty on all work.

8. The Bishops had arranged construction financing through People's United Bank. For any disbursements to contractors other than the modular home company, and who were not directly supervised by the modular home company, People's required the participation of a "general contractor" to make disbursement of loan proceeds to other sub-contractors. This was reflected in the testimony of Dawn Hood, the People's Bank supervisor involved with the Bishops' loan, as well as correspondence in evidence.

9. Ms. Bishop sought clarification of this requirement in March 2010, "because the house is coming 85% completed and we only have to hire an excavator, well driller, and plumber and electrician to hook up the house". Thus, she thought "that we didn't have to have a 'GC' per se." If the bank would require it, Ms. Bishop indicated that "[w]e do have to hire a builder to attach a porch and the siding – maybe they will act as a 'GC'".

10. By email dated March 1, 2010, Robin Mowrey, the People's representative, notified Ms. Bishop that "generally we will not allow you to be the GC."

11. The Bishops and Mr. King agreed that he would function as the general contractor, not only for disbursement of loan proceeds for the siding and porch, but also for payments to other subcontractors.

12. During trial, both Mr. King and Ms. Bishop confirmed each other's understanding that Mr. King's role as "general contractor" was limited; in fact, neither disputed that the expectation of the parties was that Mr. King's role was strictly to fulfill the Bank's requirement that someone other than the borrower be formally named in connection with approval of funds designated for various subcontractors.

13. On April 11, 2010, Mr. King signed People's Bank's form disbursement agreement as general contractor, which was also approved by the Bishops. Mr. King acknowledged that disbursement would be authorized after an inspection by a project management

company, and would be based "on the percentages completed as verified by the inspection report."

14. On April 23, 2010, Mr. King and the Bishops executed People's Bank's form acknowledgement of construction loan procedures, further supplementing the disbursement agreement.

15. In May 2010, the Bishops informed Mr. King that the modular home had been ordered. Based on the time necessary for construction in the factory, and shipping the home to the site, Mr. King and the Bishops understood that work under their contract likely would not begin until sometime in July 2010.

16. Work associated with site preparation by other subcontractors began in June 2010. Mr. King was not involved with the supervision of these efforts.

17. Mr. King and the Bishops agreed that, notwithstanding the Bank's disbursement agreement, the Bishops would deal directly with other sub-contractors, and would pay them once the Bank approved the disbursement request.

18. Based on the Bishops' June request for disbursement for the payment of the subcontractors who did site construction, including building the driveway and installing the foundation, Ms. Bishop testified that she arranged to meet Mr. King so that he could execute a payment request and a release and waiver.

19. Based on the payment request and waiver, the Bank issued a check for $26, 600 on June 8, 2010 made out to Brian and Courtney Bishop and Vernon King Builders.

20. According to Ms. Bishop, and pursuant to the understanding she had reached with Mr. King, she met Mr. King in her mother's driveway where he endorsed the check. She then deposited the check and used the proceeds to pay the subcontractors.

21. Mr. King disclaims that he executed the payment request, or the release and waiver, or that he endorsed the June 8 check. He maintains that the signatures on those instruments purporting to be his were forgeries. He claims not to have learned about any of the transactions until he began making inquiries of the Bank in Sept. 2010 after the parties had entered into a dispute over performance under the contract.

22. Mr. King does not claim, nor is there any evidence to support, that he was entitled to proceeds from the June 8 check. He was a payee solely as a result of his designation as general contractor.

23. As with the June 8 check, Ms. Bishop testified that she again arranged to meet Mr. King to have him approve another payment request for further site work, including excavation, foundation, crane expenses, set crew costs, partial siding costs and expenses for roughing in basement plumbing.

24. After submission of the payment request and waiver dated July 20, the Bank issued a check for $28,800 made out to the Bishops and Mr. King.

25. By Ms. Bishop's account, after securing Mr. King's endorsement, she attempted to make a deposit into her account at Bank of Bennington, where the check was not accepted because the Bank of Bennington did not believe it could properly be deposited to a personal account as opposed to a business account.

26. After consulting with People's, a check for $20,000 was reissued. According to Ms. Bishop, the lesser amount as compared to the original check for the amount of $28,800 was due to a teller error. This was subsequently adjusted by means of a wire transfer directly to the Bishops' account for the balance of the $8,800.

27. Ms. Bishop testified that she arranged for Mr. King's signature of the replacement check at a hot dog stand in Manchester. Although her verified answer and counterclaim represent that the transaction took place at 1805 Sawmill Hill Road in Wells, Vt., Ms. Bishop testified that this was an error she did not notice in reviewing the pleading.

28. Ms. Bishop subsequently deposited the check in Mr. Bishop's business account, and used the proceeds to pay the subcontractors for the work itemized in the payment request.

29. As with the June 8 check, Mr. King disclaims any knowledge or involvement with the payment request, the release and waiver associated with it, or the endorsement of either the check for $28,800 or the replacement check for $20,000.

30. Also similarly to the earlier disbursement, although Mr. King denies endorsing the check, he does not claim, nor does any other evidence establish, that he was entitled to any of its proceeds. He was a payee solely as a result of his designation as general contractor.

31. Around the third week of July 2010, Mr. King began to perform the work specified by his April 10 contract with the Bishops. Mr. King claims that the modular home had not been adequately prepared by the company's prep crew.

32. The modular units came from the factory with a certain amount of siding installed; however, by Mr. King's assessment, most of that had to be removed. As he explained to the Bishops, the siding that had already been installed was not anchored to corner components that he would need to install as part of his work. In Mr. King's opinion, the remaining siding could not be properly installed, together with the corners, without first taking down what came from the factory, and beginning the installation from the bottom up.

33. Mr. King informed the Bishops that the complications arising from the delivery of an inadequately prepped modular home had resulted in the need for more time and labor on his part than their original contract had anticipated.

34. Mr. King demanded that the Bishops execute a second contract, which they did with extreme reluctance on Aug. 7, 2010. The new contract recited that it was: "For extra work on home, this is results of poor workmanship of set crew that set home. These poor workmanship has created much more extra work for the Generale Contractor Vernon C. King" (sic).

35. The new contract increased the price by $4,000, to $14,000. It acknowledged a prior deposit of $3,000, a further deposit on the new contract of $2,500, with $8,500 as the "balance on the job". It further recited: "This is a attachment to first proposal sign by both parties" (sic).

36. Although Mr. King initially employed two workers on the Bishops' project, within a few days the only person performing labor under the contract was Robert Jaworski. By Ms. Bishop's credible testimony, shortly after work began, no one appeared to work on the project for a week.

37. In early September 2010, under the belief that the work was approximately 50% accomplished, Mr. King made an oral demand for another payment from the Bishops in the amount of $1,500.

38. Ms. Bishop did not believe there had been sufficient progress toward completion to justify a further advance. She informed Mr. King that the matter could be discussed

4

again if significant additional progress was made during the next week, and if the materials for the construction of the porch had been delivered.

39. At that point, significant work remained to be accomplished to complete the installation of the vinyl siding. The installation of soffits and facia required by the contract was incomplete as well. No work had been commenced on the construction of the porch, nor had Mr. King ordered any materials.

40. The evidence does not support Mr. King's claim that the total work anticipated by the contract was approximately 50% complete. It was no more than 1/3 complete, and aspects of what was claimed as completed eventually proved unworkmanlike.

41. After Ms. Bishop informed Mr. King that she would not honor his request for an immediate additional payment of $1,500, he informed her that he would not continue working without payment. Thereafter, neither Mr. King nor Mr. Jaworski returned to the job site to perform any additional work.

42. Mr. King never submitted a written invoice to the Bishops informing them of a claim for work that had been performed, and a demand for payment. Except for his oral demand for payment, Mr. King never provided the Bishops with any other explanation for a claim that the Bishops were in breach of the contact.

43. Ms. Bishop made several attempts over the days immediately following Mr. King's demand to have further conversations. She left him messages by voicemail and email. Mr. King did not return the messages.

44. When Mr. King left the work site at the Bishops' home for the last time, he left certain tools behind. It is undisputed that he later retrieved most of the tools with the assistance of law enforcement. No charges were brought against the Bishops in connection with Mr. King's claim that they were illegally withholding his tools.

45. Although Mr. King claims that even with law enforcement assistance he had been unable to retrieve certain tools, there is no credible evidence that the Bishops retained them.

46. Shortly after telling Ms. Bishop that he would not continue work on the contract without another payment, Mr. King contacted Peter O'Brien, a vice president at TD Bank in Granville, NY to make inquiry about the $20,000 check issued by People's Bank on July 30.

47. Mr. O'Brien had previously communicated with Mr. King on August 2 concerning the check. When Ms. Bishop deposited the check in Mr. Bishop's business account at TD Bank, its loss prevention specialists questioned whether Mr. King was authorized to endorse the check on behalf of Vernon King Builders. Mr. O'Brien had contacted Mr. King to verify his authority with respect to Vernon King Builders.

48. As a result of Mr. O'Brien's conversation with Mr. King, Mr. King executed an affidavit describing his relationship to Vernon King Builders and delivered it to TD Bank. As a result of the delivery of the affidavit, TD Bank accepted the $20,000 check for deposit in Mr. Bishop's account.

49. Mr. O'Brien does not recall that, during their conversations in early August, Mr. King claimed that the endorsement of his name on the $20,000 check was a forgery. Mr. O'Brien similarly disclaims any such statement having been made during his subsequent conversation on or about Sept. 10, 2013.

50. Mr. King sought and obtained from People's Bank copies of all documents associated with the Bishops' project bearing a signature purported to be his.

51. After reviewing the documents, Mr. King consulted with an attorney regarding his concern over his contractual relations with the Bishops, including his belief that his signature had been forged. There was some contact between Mr. King's attorney, and an attorney retained by the Bishops during the period shortly after communication between the principals terminated. The evidence did not examine the nature of the contacts between counsel.

52. Mr. King made a report to the Manchester Police alleging that Mr. and/or Ms. Bishop had forged his name on the checks, as well as the requests for disbursement and waivers and release.

53. The Manchester Police declined to refer Mr. King's complaint for prosecution. Mr. King filed a civil suit claiming that the refusal to prosecute was a violation of his civil rights.

54. Acting as his own legal representative, Mr. King also filed suit against the Bennington State's Attorney and the Vermont Attorney General similarly based on his claim that his civil rights had been violated due to the refusal of those two offices to bring criminal charges against the Bishops.

55. The four suits filed by Mr. King alleging civil rights violations eventually were either withdrawn or dismissed.

56. Mr. King acknowledges having filed other suits that he later dismissed. He described this tactic as "sending a warning shot, a cease and desist", insisting that "there is nothing in the law that says I can't."

57. As a result of Mr. King's claim to People's Bank that his signature had been forged, the Bishops were unable to draw on their construction loan until sometime in the spring of 2011. In order to pay for the installation of a furnace, they had to delay until February 2011 when they had saved enough to pay for it, while still waiting to resolve access to the remaining proceeds of their construction loan.

58. In summer, 2011, once the ability to make further draws against the loan proceeds had been confirmed, the Bishops retained Paul Getty to assess work which remained uncompleted under their contract with Mr. King.

59. Mr. Getty is an experienced builder, with considerable expertise in the installation of vinyl siding, including such installation in connection with finishing the siding on pre-fabricated modular homes on which siding had been partially installed.

60. According to Mr. Getty's credible testimony, very little of the work supervised by Mr. King met expected standards of workmanlike construction.

61. Mr. King should not have removed the factory-installed siding, the claimed defects in which was the reason Mr. King gave the Bishops for the second contract calling for an increase in price by $4,000.

62. Had Mr. King been sufficiently knowledgeable as to the proper techniques for installing siding, no removal would have been necessary in order to install corners, and in order to continue proper and weather-tight installation above the factory-installed level.

63. In fact, at the time Mr. Getty took over responsibility for construction, little additional installation had been accomplished above the levels of the original factory-installed levels, which Mr. King needlessly removed and then replaced.

64. By Mr. Getty's credible description, only "the gravy work" had been done. With the exception of one section in the back of the home, no siding had been installed above the 8-10 foot level.

65. Most soffits had not been installed. One eve soffit was installed upside down, such that it would not have vented properly.

66. There was no sill trim under windows, and corner posts were improperly installed, preventing proper locking of the siding components.

67. Flashing had been installed carelessly, making it likely that water would enter the structure.

68. Mr. Getty charged the Bishops $19,000 to complete the work specified by the contract between the Bishops and Mr. King, of which $1,500 was made necessary to correct unworkmanlike errors by Mr. King.

69. Based on Mr. Getty's persuasive description of the work necessary to accomplish the remaining tasks specified by the contract, the Court finds that the amount he charged was reasonable under all the circumstances.

70. In connection with this lawsuit, Mr. King retained Charles Roemmelt as an expert in handwriting. Mr. Roemmelt analyzed known exemplars of Mr. King's signature, and compared them to the signatures on the checks for $26,600, $28,800 and $20,000, together with the signatures on the disbursement requests and releases associated with those checks. He cites a number of differences revealed by the comparison as sufficiently distinctive to justify the conclusion that Mr. King did not sign the instruments he has disclaimed.

71. Mr. Roemmelt also compared known exemplars of Ms. Bishop's signature to the signatures purporting to be Mr. King's. He cites a number of similar characteristics as justifying the conclusion that she signed the instruments, and not Mr. King.

72. Mr. Roemmelt has extensive experience in handwriting analysis, including having been accepted as an expert witness.

73. Mr. Roemmelt was admitted to the bar in New York in 1977. In 1998, he was convicted of federal tax fraud based on having filed a fraudulent tax return. He was required to make restitution in the amount of $20,000.

74. Mr. Roemmelt was suspended from the practice of law in 1999, following his conviction. He testified that he voluntarily withdrew from practice since he had already been retired since 1992. However, he was forced to correct his claim of voluntary acquiescence to suspension from legal practice on further cross-examination, which included documentary proof that he had challenged the suspension on appeal, and that the suspension was affirmed.

75. Mr. King paid Mr. Roemmelt $900 for his Oct. 2012 report, and $2,300 for his appearance at trial as an expert witness.

**Discussion and Conclusions of Law**

From a modest construction contract dispute, this case has spawned a plethora of claims for relief, most of which are not supported by the evidence. The issues associated with the performance of the construction contract are not complex, and the evidence tilts resolution decisively in favor of the Bishops. The other claims, particularly those bound up with the allegations and denial of forgery, attracted more attention during the

7

presentation of evidence than the issues directly framed by the terms of the contract. In the end, however, the resolution of the allegations related to forgery is unnecessary to the determination of breach of contract. In any event, the evidence on either side of the forgery issue is so tangled and equivocal that neither party can be found to have met the burden of proof with respect to his, her or their claims.

*Breach of Contract, Breach of Warranty & The Prompt Payment Act*

The determination of the competing claims regarding the performance of the April 10, 2010 contract turns on the assessment of credibility, as between the testimony of Mr. Getty, as compared to that of Mr. King and Mr. Jaworski. That does not present a close question. Mr. Getty has significantly more experience in the installation of vinyl siding than either Mr. King or Mr. Jaworski. His experience includes installation on modular homes in connection with the partial installations accomplished at the factory. His explanation of the tools and techniques associated with this specialized sub-skill of the construction trades made evident Mr. King and Mr. Jaworski's relative lack of qualifications to take on the work specified by the contract. Mr. Getty's authoritative explanations convince the Court that he accurately described the standards of good and workmanlike expectations in the installation of vinyl siding under the circumstances established by the contract. *See Long Trail House Condo. Ass'n v. Engelberth Constr.,* 2012 VT 80, ¶ 31, 192 Vt. 322 (recognizing an implied warranty of good and workmanlike construction). Mr. Getty's conclusion that the work performed under Mr. King's supervision did not meet those standards is well-supported by the evidence.

Mr. Getty persuasively undermined Mr. King's representation to the Bishops that his ability to begin work under the contract was compromised by errors or sloppy work in manufacturing or setting up the modular home. Rather, it is likely that: i) the combined inexperience of Mr. King and Mr. Jaworski, prevented their understanding of the proper methods for integrating the work already pre-fabricated at the factory, with the additional tasks contemplated the scope of work described in the contract; and/or ii) Mr. King belatedly realized that he had underbid the job based on a further assessment of the likely scope of the work In any event, Mr. King needlessly removed the factory-installed siding, wrongly believing it had been installed in a faulty manner. Due to this misperception, or his re-evaluation of the amount of necessary work, Mr. King convinced the Bishops to execute an addendum to the contract, adding $4,000 to the contract price, representing that it was associated with the performance of entirely unnecessary work. Because there was no consideration for the second contract raising the contract price by $4,000, the increased price is unenforceable. *See Weed v. Weed*, 2008 VT 121, ¶ 14, 185 Vt. 83 ("Both parties must regard a bargained-for promise or act as consideration.").

Similarly, Mr. Getty's testimony established that the work contemplated by the contract with respect to the installation of the vinyl siding, without even taking into consideration the uncommenced construction of the porch, was no more than 1/3 completed at the time Mr. King refused to perform further. Moreover, significant aspects of the work claimed as complete was defective, including misjoined corners, lack of sills,

improperly installed soffits, and flashing of such poor workmanship that it would not stand up to weather.

The original contract contemplated, after a deposit of $4,000, another payment of $3,000 when the work was one-half completed. Under those terms, Mr. King had not yet performed sufficiently to be entitled to the additional payment. Yet, pursuant to the August 2 addendum, made without adequate consideration, the Bishops had paid Mr. King an additional $2,500. That revised contact made no provision for additional payment until the work was completed, at which time it specified that $8,500 would be due. Whether measured against the terms of the first agreement, or the terms of the unenforceable second agreement, Mr. King's demand for additional payment was not supported by any express contractual term, particularly since his performance at that point was insubstantial and sub-standard.

By insisting that he was entitled to the extra payment in September as a condition for performing the balance of the work under the contract, Mr. King's actions in failing to continue to perform placed him, not the Bishops, in breach of the contract. *See McGee Constr. Co. v. Neshobe Dev., Inc.*, 156 Vt. 550, 555–56 (1991) (noting that walking off the job without sufficient justification was a breach of contract). At that point, the Bishops were entitled to engage Mr. Getty to perform the work left uncompleted by Mr. King. Mr. Getty's bill for the remaining work, $19,000, including the need to correct Mr. King's defective performance, was reasonable under the circumstances. The Bishops' measure of damages is the difference between the original contract price and the amount paid to complete the contract. *See id.* at 557–58; *see also* Restatement (Second) of Contracts § 347 (describing how to calculate contract damages). In this case, the Bishops contracted with Mr. King to do all of the work for $10,000. By the time the work specified by the contract was complete, the Bishops had paid $5,500 to Mr. King and $19,000 to Mr. Getty. The total cost was $24,500, which leaves the Bishops with damages of $14,500.

In filing his complaint, Mr. King invoked Vermont's Prompt Payment Act, (PPA) 9 V.S.A.§ 4001 et seq. By the terms of § 4002(a), an owner must pay a contractor "strictly in accordance with the terms of the construction contract." The Act further provides that, in the absence of "a term governing the terms of payment", a contractor "shall be entitled to invoice the owner for progress payments at the end of the billing term", in which case payment is due within 20 days after delivery of the invoice. § 4002(b)&(c). Notwithstanding these requirements, an owner may withhold payment "equaling the value of any good faith claims against an invoicing contractor…including claims arising from unsatisfactory job progress, defective construction, [or] disputed work…§ 4007(a). With respect to claims for payment based on the PPA, § 4007(c) provides for the award of attorneys fees to "the substantially prevailing party."

Having based his claim for payment under the contract on the PPA, Mr. King has failed to establish any right to relief. First, there is no evidence that Mr. King ever presented the Bishops with an invoice, which is the threshold procedural requirement to establish a right to the enforcement mechanisms established by the Act. More crucially,

at the time he made his oral demand for additional payment, as discussed above, Mr. King was not entitled to funds either by an express term of the parties' contract, or by a demonstration of substantial performance.  In fact, even had Mr. King attempted to perfect his PPA claim by the tender of an invoice, the Bishops would have been justified in refusing under the protections for good faith disputes over the work as provided in § 4007(a).

With regard to Mr. King's PPA claim, the Bishops have prevailed entirely and are entitled to an award of their attorneys fees. See, *Burton v. Jeremiah Beach Parker Restoration and Construction Management Corp.* 2010 VT 55, 188 Vt. 583; *The Electric Man v. Charos*, 2006 VT 16,179 Vt. 381.

*Fraud, Conversion, Consumer Fraud & Defamation*

Mr. King's counts for fraud and conversion, and the Bishops' counterclaim for consumer fraud and defamation, each turn on the issues arising from Mr. King's claim that Ms. Bishop forged his signature on certain of the checks and instruments associated with the bank loan which financed the Bishops' purchase of their modular home, and was expected to finance payment of the work described by the parties' construction contract. The evidence is sufficiently equivocal that neither party can be said to have met the burden of proof by a preponderance in regard to any of these claims.

It is plain the Mr. King's fervent insistence that he was the victim of multiple forgeries has fueled this litigation.  Nevertheless, the claim is essentially tangential to the respective obligations of the parties under the contract.  Mr. King claimed to be unaware of any forgery at the time he left the job, and refused to come back to work in the absence of payment toward the contract price.  While it is evident that Mr. King's engagement of the police and law enforcement in the aftermath of the parties' rift likely precluded any resumption of productive owner-contractor relations, it is far less obvious that the alleged unauthorized signatures, assuming Ms. Bishop executed them, constituted breach of any term of the construction contract.  In any event, Mr. King had already repudiated any intention to complete performance on the contract well in advance of his campaign to engineer forgery charges against his clients.

It is also patent that Mr. King has not proved any damages, even had he succeeded in proving one or more forgeries.  There could be no conversion, because no funds ever belonged to Mr. King. *See Montgomery v. Devoid*, 2006 VT 127, ¶ 12, 181 Vt. 154 (defining conversion as "an intentional exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel.").  By his own description, he was simply a designated payee in his "limited capacity" as the titular general contractor required by People's Bank.  None of the funds authorized for disbursement as represented by the three checks was associated with any work performed by Mr. King, as that work had not commenced in June, and was barely under way at the end of July (and still covered by the initial deposit).  Similarly, there was no fraud.  Proof of fraud requires a misrepresentation that results in monetary harm. Restatement (Second) of Torts § 525;

10

*see also Winey v. William E. Dailey, Inc. See* 161 Vt. 129, 133 (1993) (adopting the Restatement).  Since none of the funds belonged to him, Mr. King has no claim of injury even if the signatures on the checks were not his.

The Bishops' claims rest on causal connections that are almost as attenuated. They posit a deceptive scheme arising after the breach of contract had already occurred, ostensibly to provide Mr. King with a further justification for non-performance.  Yet, actionable deceptive acts under the Consumer Fraud Act must occur at the inception of the sale of goods or services, and the consumer must have relied upon the deception in entering into the consumer transaction.  *See Winey*, 161 Vt. at 134–35. Defamation is more plausibly made out by the allegation of a false claim of forgery, though the connection between the publication and actual monetary injury is tenuous.  The reason for the Bank's delay in releasing the proceeds of the construction loan was left speculative by the evidence.  Even had it been well-established that such delay resulted directly from the claim of forgery, and was beyond prompt cure by any diligence on the Bishops' part, it is doubtful that the inconvenience resulting from the delay in completing the modular home installation can be recovered as compensatory damages for defamation.

Nevertheless, the root of each party's problems with the claims related to the alleged forgery is the lingering doubt as to whether or not someone substituted a false signature for Mr. King's. Mr. Roemmelt's analysis, supported by his extensive experience, cast a degree of suspicion upon the signatures. However, his credibility as an expert was badly damaged by his tax fraud conviction, and his attempt to minimize the significance of the New York disbarment proceedings. Based on his description of his methodology, when coupled with his tarnished reputation and the incentives associated with his fees, the Court is skeptical that his conclusions should be granted the imprimatur of science.  Meanwhile, Mr. King is a tenacious and prolific self-represented litigator, who admits he believes he is entitled to use legal proceedings to "fire a warning shot" in order to compel a "cease and desist", and that nothing in the law precludes such an approach. With such little apparent knowledge of, or regard for, the strictures of V.R.C.P. 11,[1] Mr. King's alliance with an expert with a fraud conviction warrants a very cautious approach to their joint theory of the case.

---

[1] V.R.C.P. 11(b) provides: By presenting to the court (whether by signing, filing, submitting, or later advocating) a pleading, written motion, or other document, an attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:
(1) it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation;
(2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law;
(3) the allegations and other factual contentions have evidentiary support, or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery; and
(4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on a lack of information or belief.

On the other hand, the Court acknowledges that Ms. Bishop's recollection of where one of the endorsements occurred differs from the account she gave in her verified answer and counterclaims. Furthermore, as evidenced by the early communications with her loan officer, Ms. Bishop felt burdened by having to engage a general contractor as an intermediary for the disbursement of modest funds. It requires little imagination to conceive that she might have felt justified in assuming the authority to endorse instruments on behalf of Mr. King, whose function in the transactions was acknowledged by both of them as limited by his agency as a pass-through. While she might have assumed initially that this exercise of presumed authority was inherent in her understanding with Mr. King as to his role as "general contractor", by the time these proceedings commenced that assumption had become manifestly untenable. These are all inferences regarding motive that might have made a stronger impact in light of the arguable anomalies described by Mr. Roemmelt, but for the credibility deficits just discussed. In addition, considering their testimony as a whole, Ms. Bishop was far more credible than Mr. King.

In sum, in light of these vagaries in the evidence, the scales of justice hang even as to the genuineness of Mr. King's signatures on the challenged documents. Neither party's evidence suffices to make downweight against the other. *See In re Grievance of Muzzy*, 141 Vt. 463, 472 (1982) (indicating plaintiffs in civil cases must prove their claims by a preponderance of the evidence). For the reasons just discussed, judgment for the Bishops must enter as to Mr. King's claims of fraud and conversion, and judgment for Mr. King must enter as to the Bishops' claims of consumer fraud and defamation.

**WHEREFORE** it is hereby **ORDERED:** Judgment is entered for Defendants as to Plaintiff's complaints for breach of contract, recovery under the Prompt Payment Act, fraud and conversion. Judgment is entered for Defendants in the amount of $14,500 as to their counterclaims for breach of contract and breach of warranty, together with attorney's fees under 9 V.S.A.§ 4007(c). Defendants shall submit an itemized claim for attorneys fees within 20 days of this order. Judgment is entered for Plaintiff on Defendants' claims for Consumer Fraud and defamation.

Dated and signed electronically at Bennington, Vermont this 12th day of November, 2013.

_John P. Wesley_

_____
John P. Wesley
Civil Division Judge